No. 22474.

JOHN P. BARLOW, GERALD THEO BARLOW, EDITH J. WILLIAMSON, VIOLET E. STRIDE, PERCY M. BARLOW AND LYNN S. BARLOW v. ARTHUR E. BARLOW, ROBERT L. BARLOW, AS ADMINISTRATOR OF THE ESTATE OF ARTHUR N. BARLOW, DECEASED.

(463 P.2d 305)

Decided December 22, 1969.

466

DICKERSON, BARRY & DWYER, CHARLES A. MURDOCK, for plaintiffs in error.

ALVIN WEINBERGER, MATTSON & MATTSON, for defendant in error Arthur E. Barlow.

*En Banc.*

Mr. Justice Groves delivered the opinion of the Court.

Arthur N. Barlow died intestate on April 26, 1962, leaving an estate of substantial size. The probate court determined that Arthur E. Barlow had become his adopted son under the "principle of equitable adoption" and, therefore, was his sole and only heir. The plaintiffs in error are brothers and sisters of the decedent and, if the defendant in error Arthur E. Barlow is not entitled to inherit the estate, they are so entitled. The decedent will be referred to as Arthur and Arthur E. Barlow as Eugene. We affirm the court's determination of heirship.

In 1919 Arthur had as one of his business pursuits the illegal transportation of intoxicants from Canada to the Denver area and the sale of the same. In Wyoming he met and became intimately acquainted with his future wife, who will be referred to as Margaret. Margaret testified that in 1920 "we decided that I'd come to Denver, so we just made an agreement that I'd come down here and we'd live together as man and wife . . . we talked about marriage . . . I thought — we intended to be married." Upon her arrival in Denver, Arthur introduced her as his wife. They lived together, and held themselves out, as husband and wife and did not have a civil marriage ceremony until February 23, 1924. The following appears in the transcript of testimony while Margaret was being cross-examined:

"Q. Well, but during all those years you did attempt to get him to go with you and have a civil marriage performed, didn't you?

"A. We would talk about it, then something would happen and we wouldn't go.

"Q. Yes.

"A. And that just went on, and then finally he said to me one time after a year or maybe a little better, he said, 'It doesn't make any difference now. You're my common law wife anyway, so it doesn't make any difference

whether we have a civil ceremony or not, because we're just the same as married. We are married.' "

During the 1920's they did not use the name of Barlow, but rather used several other names — this procedure being advantageous by reason of the nature of Arthur's liquor business.

In 1923 Bessie Costello was living unhappily with her husband Frank Costello at Florence, Colorado. Each of the Costellos had children by former marriages and two had been born as a result of their union. Mr. Costello drank to excess and was abusive. Mrs. Costello left him and came to the Denver area. Shortly thereafter she discovered she was pregnant and this child, *i.e.*, Eugene, was born in Denver on January 13, 1924.

After Mrs. Costello became aware that she was pregnant she became acquainted with Arthur and Margaret. They were unable to have children of their own and desired a child. By reason of her impoverished circumstances Mrs. Costello desired to have someone else take custody of the baby after it was born. An oral arrangement was made between Mrs. Costello, Arthur and Margaret that following the birth of the child Arthur and Margaret should take custody of it. Mrs. Costello agreed never to disclose to the child the fact that it was not the natural child of Arthur and Margaret. Arthur and Margaret agreed to provide support for Mrs. Costello and to pay her maternity expenses, all of which they did. Mrs. Costello resided with them prior to the child's birth and for a short time thereafter. Mrs. Costello did not see Eugene from the time he was a baby until 1959 when they met each other and he was advised "that he was an adopted child."

Mrs. Costello testified with respect to the arrangement made prior to Eugene's birth, "That was my understanding that they [Arthur and Margaret] were going to adopt him." Margaret testified that at that time, "we said we would adopt him and we'd take care of him, educate him and care for him, just like he was our own."

Mrs. Costello testified that, following Eugene's birth and his delivery to Arthur and Margaret she went to Florence, Colorado, and advised her husband of the fact of birth and the disposition of the child; and that Mr. Costello indicated his satisfaction with the agreement. Mr. Costello never saw Eugene, Arthur or Margaret, nor did he have any contact with any of them. He died when Eugene was about one and one-half years of age.

Arthur and Margaret entered into a civil marriage about six weeks following Eugene's birth. When asked the reason for entering this marriage, Margaret testified as follows:

"Because we were going to adopt the baby, and we wanted to have the adoption papers, and we were married under the name of Barlow, Arthur N. Barlow's correct name, and we wanted the baby to have that name because that was our true name."

Not long thereafter Arthur and Margaret asked their attorney to represent them with respect to their adoption of Eugene. Margaret stated:

"[The attorney] threw his hands up and said there wasn't a chance for us to get adoption papers, that we'd better just drop that, that to keep the baby and keep still, not try to get any adoption papers, because they would certainly take the baby away from us."

The reason for this advice was Arthur's "bootlegging" activities. They did not pursue the matter further at that time. By the time Eugene was four years old, Arthur and Margaret were represented by another attorney and they asked him about the possibility of adoption. His response was similar to that of the first attorney. Eugene therefore was never formally adopted.

From the time Eugene entered school he was known solely as Arthur E. Barlow. The one exception was in connection with Margaret's divorce action against Arthur in 1936 and 1937. She engaged a lawyer who in these proceedings has been one of the attorneys for plaintiffs in error, and she stated that she made a full disclosure

of the facts to him. He prepared a divorce complaint which Margaret verified and which contained the following allegation:

"That at the time of the marriage of the parties hereto, they took under an agreement, an infant child of the age of ten days to-wit, one Arthur Costello, which said child has since been in the care and custody of the said plaintiff and still is. That no adoption proceedings were ever actually had and that the said defendant has on occasions too numerous to mention beat, struck and wounded the said plaintiff without provocation, and on each occasion has threatened that he will cause the said child Arthur Costello to be taken away from the said plaintiff in the event she makes any complaint against the said defendant, or in the event she would endeavor to secure any alimony or support money for herself. That said child is now approximately of the age of 13 years, and has always taken the name of the parties hereto, and is known by the name of Arthur Barlow."

In 1943 Eugene needed a certified copy of a birth certificate in order to enlist in the Navy. Margaret was able to have a birth certificate issued through the County Court of Jefferson County, Colorado by certifying that Arthur Eugene Barlow was born on January 16, 1924 in Jefferson County, and that she was his mother and Arthur Newell Barlow was his father.

Throughout Eugene's life, the practical relationship between Arthur and Eugene was that of father and son. Prior to the separation of Arthur and Margaret, Arthur furnished all support for the family. Thereafter, he furnished Eugene with clothing, spending money, and medical attention. Eugene visited with Arthur periodically and was with Arthur at the time of the latter's death.

The probate court made findings to the following effect: That the basis for the determination that Eugene was the sole and only heir is that there was a contract between Arthur and Margaret on the one hand and Mrs. Costello on the other providing for the adoption of

Eugene; that by reason of Mr. Costello's conduct this contract was binding upon him; that it was the intention of Arthur and Margaret to adopt the child; and that there was no direct attack on the adoption by either the natural or adopting parents. The court also reached conclusions of law that there was no compliance with the adoption statute in effect at the time the contract was made (1921 Compiled Laws of Colorado §5512 *et seq.*); that at the time there was no relinquishment statute; that the application of the principle of equitable adoption has "in some fashion" been recognized in *Dominguez v. Booth,* 101 Colo. 192, 72 P.2d 276; and that, the status of parent and child having been carried on throughout the years without objection from any of the parties involved, equity should demand recognition of the principle of equitable adoption.

I.

The plaintiffs in error have not questioned the existence of the doctrine of equitable adoption at the time involved. Rather, their argument is that the evidence was insufficient to establish such an adoption; that this court has the right to make its own findings of fact; and that the consent of Eugene's natural father was a necessary requisite to a valid equitable adoption.

As to the existence of the doctrine of equitable adoption, or rules under different names but with analogous effect, counsel for Eugene cites *Dominguez v. Booth, supra, Sheffield v. Barry,* 153 Fla. 144, 14 S.2d 417; *Crawford v. Wilson,* 139 Ga. 654, 78 S.E. 30; *Clemons v. Clemons,* 193 Okla. 412, 145 P.2d 928; and *Jones v. Guy,* 135 Tex. 398, 143 S.W.2d 906. We embarked upon some additional research and encountered the following: Annots., 27 A.L.R. 1325, 142 A.L.R. 84 and 171 A.L.R. 1315; *H. Clark, The Law of Domestic Relations in the United States* 654 (1968); Bailey, *Adoption "By Estoppel",* 36 *Texas L. Rev.* 30 (1957); Comment, *Adoption by Estoppel: History and Effect,* 15 *Baylor L. Rev.* 162

(1963); 45 *Iowa L. Rev.* 159 (1959); and 35 *S. Cal. L. Rev.* 491 (1962).

 The doctrine applicable here has been called by several names, such as adoption by contract, equitable adoption, estoppel to deny adoption, de facto adoption and creation and development of status. *Dominguez v. Booth, supra,* quoted opinions of other courts, one holding on the basis of status; another under a parol contract; and a third by estoppel of the collateral heirs. As the opinion seems to imply that its author had "equitable adoption" in mind, we will use that term. By this we mean a situation involving an oral contract to adopt a child, fully performed except that there was no statutory adoption, and in which the rule is applied for the benefit of the child in the determination of heirship upon the death of the person contracting to adopt. This is distinguishable from a contract to leave property by will.

We have considered only the adoption statutes existing in 1924, which were in the 1921 compiled laws and were here cited earlier. We give no opinion nor hint as to whether the doctrine of equitable adoption has been affected by subsequent statutory enactment. As indicated by the probate court, *Dominguez* (which involved a time during the existence of the same adoption statute) recognized the doctrine of equitable adoption.

## II.

 The plaintiffs in error suggest that we should make our own findings of fact from the testimony of the natural mother and the exhibits, citing *State v. Grooms,* 110 Colo. 264, 133 P.2d 379. We do not regard that case as applicable and rather we address ourselves to the question of whether the probate court's determination is adequately supported by the evidence.

## III.

 The plaintiffs in error have called our attention to 2 Am. Jur. 2d *Adoption* §20, where it is stated:

"One claiming benefit of an alleged oral contract for adoption, and to share in the estate of an adoptive parent

by virtue of such contract, has the burden of establishing the contract by evidence so clear, cogent, and convincing as to leave no reasonable doubt as to the fact that such agreement was made."

We accept this as a correct statement of law. We must assume that the probate court had this principle of law in mind when it made its findings. The plaintiffs in error argue rather vigorously that the evidence not only was insufficient, but was not clear, cogent or convincing. They emphasize the transgressions of the law by Arthur and Margaret as reason to question the credibility of Margaret. They argue that the natural mother was interested only in relieving herself of the responsibility of a child and was not making a contract for the child's adoption. These arguments were presented to the trial court and it made findings to the contrary, supported by adequate evidence. Counsel further contend that an intent or an attempt to obtain an adoption decree does not form the basis for an equitable adoption. With the other facts involved, such an intent or attempt is but a portion of the factors here supporting application of the doctrine. The findings were adequately supported by the evidence.

## IV.

Plaintiffs in error indicate that there was not a valid common law marriage between Arthur and Margaret at the time of the making of the oral contract to adopt. The probate court made no finding on this issue. It appears to us that the evidence established that there was a valid common law marriage at the time. However, we regard the point as immaterial. We are here concerned with whether Arthur made a contract to adopt and this he could have done even if he were not married.

## V.

The remaining point urged by plaintiffs in error is that there could not be an equitable adoption as the consent of Eugene's father to the adoption was not obtained. Under the adoption statute in effect at the time a consent was not necessary by a parent who had aban-

doned the child, and we regard the testimony as supporting a finding of abandonment. Further, as the doctrine of equitable adoption comes under the category of equity, consent can be established by conduct. Here the testimony as to the natural father's conduct was sufficient to support a finding of consent. Beyond these considerations, we know of no authority by which collateral heirs may take advantage of a lack of consent to defeat an equitable adoption. A determination of invalidity of adoption by reason of lack of consent arises in cases in which one or both of the natural parents seek to attack it. In any event, the collateral heirs are in no position to raise the issue.

Judgment affirmed.