2003 WY 119

**In the Matter of the ESTATE OF Neil A. SEADER.**

**Kim Sanderson and Kirk Olive, Appellants (Respondents),**

v.

**Ronald Bathrick, duly appointed and acting Personal Representative of the Estate of Neil Adam Seader, Neil J. Seader and Charles Lee Seader, Appellees (Petitioners).**

No. 02–224.

Supreme Court of Wyoming.

Sept. 23, 2003.

Representing Appellants: Megan L. Hayes and Stephen J. Jouard of Dwyer, Huddleson and Ray, P.C., Fort Collins, Colorado.

Representing Appellees: Lance T. Harmon of Bailey, Stock & Harmon, P.C., Chey-

enne, Wyoming; and Matthew H. Romsa of Romsa Law Office, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1]   The district court refused to apply the doctrines of equitable adoption, adoption by estoppel, and virtual adoption to avoid the operation of the anti-lapse statute. The district court also concluded that the testator's will did not evidence an intention that the share of a predeceased devisee pass to that devisee's children. The devisee's children appealed. We affirm.

## ISSUES

1. Whether the doctrines of equitable adoption, adoption by estoppel, and virtual adoption are available under Wyoming law to allow the descendents of a predeceased stepchild to be considered lineal descendents of their step-grandfather under the anti-lapse statute?

2. Whether the district court erred in concluding that the testator's will did not evidence an intention that the share of a predeceased devisee pass to that devisee's children?

## FACTS

[¶ 2]   Julie L. Schroeder (Julie) was born on August 13, 1943 to Mary Allen Cirksana (Mary) and Louis Sylvester Burke.[1]   When Julie was two years old, Mary married Neil Adam Seader (Neil). At the time of the marriage, Neil agreed to adopt Julie. Over the years, Neil voiced his intention to adopt Julie, and he treated her as if she were his natural daughter. At one time, Mary and Neil discussed adoption with an attorney, but decided not to follow through because of the expense. Neil never did adopt Julie. Nevertheless, she used the surname "Seader" as a youth.[2]

---

1.   "Julie" is sometimes spelled "Julia" in the court file.

2.   None of the relevant motions, petitions, and legal memoranda in the record are verified or accompanied by sworn affidavits, perhaps be-

cause there does not appear to be any controversy as to the basic facts. The facts stated herein are taken from the various pleadings and are set forth in the light most favorable to the appellants.

[¶3]  Neil and Mary had two sons, Neil J. Seader (Neil J.) and Charles Lee Seader (Charles).  Mary died in 1966, leaving her entire estate to Neil.  Julie had two children, Kim Sanderson (Kim) and Kirk Olive (Kirk).  In his Last Will and Testament, dated August 30, 1996, after a few specific bequests, Neil left the residue of his estate to Neil J., Charles, and Julie.  Julie died on May 7, 2000.  Neil died on July 10, 2000.

[¶4]  Neil's will was admitted to probate on July 21, 2000.  On May 2, 2001, the personal representative of the estate filed a Preliminary Report, Accounting and Petition for Distribution, in which he noted that Julie had predeceased Neil and he proposed distributing her one-third residuary interest to Kim and Kirk. Subsequently, Neil J. filed an Objection to Preliminary Report, Accounting and Petition for Distribution, in which he contended that the testamentary devise to Julie had failed pursuant to Wyo. Stat. Ann. §§ 2–6–106 and 2–6–107 (LexisNexis 2003).[3]  Charles soon thereafter filed a similar objection.  That was followed by a Petition for Declaration of Status as Beneficiaries of Estate filed by Kim and Kirk.  Finally, Neil J. and Charles filed a Motion for Summary Judgment.

[¶5]  On February 22, 2002, the district court issued its Order Granting Summary Judgment.  The district court concluded that the residuary devise to Julie failed because she predeceased Neil and she was not Neil's "grandparent" or a "lineal descendent" of Neil's grandparent, as required by the anti-lapse statute.[4]  The district court also held that Neil's will was clear and unambiguous and that it contained no indication that it was Neil's intention to have Kim and Kirk inherit their mother's share of the estate.  Several months later, the Order Approving Accounting, and Decree of Distribution incorporated the provisions of the summary judgment order.  This appeal followed.

## STANDARD OF REVIEW

[¶6]  We recently reiterated our standard for review of summary judgments granted under W.R.C.P. 56:

When a motion for summary judgment is before this court, assuming there is a complete record, we have exactly the same duty and materials as did the district court and must follow the same standards.  *Hoblyn v. Johnson*, 2002 WY 152, ¶11, 55 P.3d 1219, ¶11 (Wyo.2002).  The propriety of granting summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and the prevailing party is entitled to judgment as a matter of law.  *Id.*  This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all the favorable inferences which may be drawn from the facts contained in affidavits, depositions, and other materials appearing in the record.  *Id.*

The party moving for summary judgment bears the initial burden of establishing a prima facie case for a summary judgment.  If the movant carries this burden, the party opposing the summary judgment must come forward with specific facts to demonstrate that a genuine issue of material fact does exist.  *Eklund v. PRI*

---

3.  Wyo. Stat. Ann. § 2–6–106 states:

If a devisee who is a grandparent or a lineal descendent of a grandparent of the testator is dead at the time of execution of the will, fails to survive the testator, or is treated as if he predeceased the testator, the issue of the deceased devisee take in place of the deceased devisee and if they are all of the same degree of kinship to the devisee they take equally, but if of unequal degree then those of more remote degree take per stirpes.  One who would have been a devisee under a class gift if he had survived the testator is treated as a devisee for purposes of this section whether his death occurred before or after the execution of the will.

Wyo. Stat. Ann. § 2–6–107(b) states:

Except as provided in W.S. 2–6–106, if the residue is devised to two (2) or more persons and the share of one (1) of the residuary devisees fails for any reason, his share passes to the residuary devisee, or to other residuary devisees in proportion to their interests in the residue.

4.  "In general, a devise or legacy left to a beneficiary in his individual capacity, and not jointly with others, will lapse upon his death prior to that of the testator, unless the testator has expressed a contrary intention, or unless a controlling statute otherwise dictates."  *Matter of Stroble's Estate*, 6 Kan.App.2d 955, 636 P.2d 236, 239 (1981).  *See also* 80 Am.Jur.2d, *Wills*, §§ 1423–1430 (2002).

*Environmental, Inc.,* 2001 WY 55, ¶ 10, 25 P.3d 511, ¶ 10 (Wyo.2001). A material fact has been defined as a fact upon which the outcome of the litigation depends in whole or in part. *Hoblyn,* 2002 WY 152, ¶ 11, 55 P.3d 1219, ¶ 11.

*Bertagnolli v. Louderback,* 2003 WY 50, ¶¶ 10–11, 67 P.3d 627, 630–31 (Wyo.2003).

## DISCUSSION

### THE ADOPTION ISSUES

[¶ 7] Julie died two months before Neil died. Had she survived him, she would have taken one-third of his residuary estate under his will. Had she been his biological daughter or his legally adopted daughter, her share of his estate would have gone to Kim and Kirk pursuant to Wyo. Stat. Ann. § 2–6–106. Likewise, had she been his biological daughter or his legally adopted daughter, and had he died intestate, her share of his estate would have gone to Kim and Kirk.[5] She was not, however, legally adopted. As a result, in an effort to take in her stead under Neil's will, Kim and Kirk now seek equitable recognition of adoptive status for their mother.[6]

[¶ 8] We previously have held that "adoption at common law was unknown and, therefore, the adoption of minor children as well as the rights and liabilities emanating therefrom are governed by statutory provisions concerning descent, distribution, and adoption." *In re Randall's Estate,* 506 P.2d 432, 432–33 (Wyo.1973).[7] We also previously have held that substantial conformity with all statutory requirements is necessary to effectuate a legal adoption. *Matter of Adoption of AMD,* 766 P.2d 550, 552 (Wyo.1988). The present question is whether, under the circumstances of this case, equity should interpose itself where no legal adoption took place.

[¶ 9] It will be helpful to preface our discussion of this issue with a consideration of the basic concepts that are involved, beginning with the meaning of "adoption." Where, as in Wyoming, that term is not statutorily defined, the courts have supplied a definition:

> In this regard, "adoption" has been defined by some courts as the establishment or creation of a legal relationship of parent and child between persons who were not so related by nature or law, whereupon the person adopted becomes the legal heir of his or her adopter, and the rights and duties of domestic relation with the adoptee's natural parents are terminated. It has been said that adoption is the legal equivalent of biological parenthood, so that a decree of adoption renders the adoptee, for all intents and purposes, the child of the adoptive parent.

2 Am.Jur.2d, *Adoption* § 1 at 869 (1994) (footnotes omitted).[8]

---

5. Wyo. Stat. Ann. § 1–22–114(b) (LexisNexis 2003) states: "Adopted persons may assume the surname of the adoptive parent. They are entitled to the same rights of person and property as children and heirs at law of the persons who adopted them." Wyo. Stat. Ann. § 2–4–101(c) (LexisNexis 2003) states, in pertinent part:

   Except in cases above enumerated, the estate of any intestate shall descend and be distributed as follows:

   (i) To his children surviving, and the descendents of his children who are dead, the descendents collectively taking the share which their parents would have taken if living[.]

6. Equitable adoption does not create an adoption; rather, it merely recognizes its existence for limited purposes. *Holt v. Burlington Northern R. Co.,* 685 S.W.2d 851, 858 (Mo.App.1984).

7. Wyoming's adoption statutes are found at Wyo. Stat. Ann. §§ 1–22–101 through 1–22–203 (LexisNexis 2003).

8. While adoption is not defined in Wyo. Stat. Ann. § 1–22–101, which is the definitions section of Wyoming's adoption statutes, Wyo. Stat. Ann. § 1–22–114, which sets forth the effects of adoption, contains language similar to that cited above:

   (a) Upon the entry of a final decree of adoption the former parent, guardian or putative father of the child shall have no right to the control or custody of the child. The adopting persons shall have all of the rights and obligations respecting the child as if they were natural parents.

   (b) Adopted persons may assume the surname of the adoptive parent. They are entitled to the same rights of person and property as children and heirs at law of the persons who adopted them.

[¶ 10] In their Petition for Declaration of Status as Beneficiaries of Estate, Kim and Kirk set forth equitable adoption, adoption by estoppel, and virtual adoption as separate causes of action. Where these doctrines have been recognized, however, they have largely been treated as interchangeable, and all are based on the same theory: "[O]ne who had agreed to adopt a child during his life, but for some reason did not, for inheritance purposes alone, will be considered to have [ … ] adopted [the child]." 2 Am. Jur.2d, *Adoption, supra,* § 43 at 918–19. Equitable adoption has been described as follows:

> While a child to be adopted pursuant to an agreement between his natural parent and the adoptive parent cannot specifically enforce its adoption by the deceased adoptive parent, nevertheless, because of the agreement, he can obtain specific enforcement of the benefits that would accrue from such adoption—this remedy is sometimes referred to as an equitable adoption.

The terms "equitable adoption," "virtual adoption," and "adoption by estoppel," have been used interchangeably by the courts. Generally speaking, the theory of recovery in an equitable adoption case is founded upon either equitable principles or upon the theory of estoppel. In the former it is a judicial remedy for an unperformed contract of legal adoption or, in the alternative, the ordering of specific performance of an implied contract to adopt. The estoppel theory operates to preclude a party from asserting the invalidity of a status of an "adopted" child for inheritance purposes. It has been said that a so-called "equitable adoption" is no more than a legal fiction permitting specific performance of a contract to adopt. Furthermore, the descriptive phrase "adoption by estoppel" has been described as a shorthand method of saying that because of the promises, acts and conduct of an intestate deceased, those claiming under and through him are estopped to assert that a child was not legally adopted or did not occupy the status of an adopted child.

An adoption by estoppel is an equitable remedy to protect the interests of a person who was supposed to have been adopted as a child but whose adoptive parents failed to undertake the legal steps necessary to formally accomplish the adoption; the doctrine is applied in an intestate estate to give effect to the intent of the decedent to adopt and provide for the child.

The doctrine is predicated on principles of contract law and equitable enforcement of the agreement to adopt for the purpose of securing the benefits of adoption that would otherwise flow from the adoptive parent under the laws of intestacy had the agreement to adopt been carried out; as such it is essentially a matter of equitable relief. Being only an equitable remedy to enforce a contract right, it is not intended or applied to create the legal relationship of parent and child, with all the legal consequences of such relationship, nor is it meant to create a legal adoption. The need for the doctrine arises when the adoptive parents die intestate; the doctrine is invoked in order to allow the supposed-to-have-been adopted child to take an intestate share. It is not applicable where the decedent dies testate.

2 Am.Jur.2d, *Adoption, supra,* § 53 at 929–30 (footnotes omitted). *See also* Rebecca C. Bell, Comment, *Virtual Adoption: The Difficulty of Creating an Exception to the Statutory Scheme,* XXIX Stetson L.Rev. 415, 419–30 (1999) (comparing estoppel and contract as bases for the theory) and Harvey A. Schneider, Comment, *Equitable Adoption: A Necessary Doctrine?,* 35 S. Cal. L. Rev 491, 492–96 (1962) (problems with contract theory).

[¶ 11] Equitable adoption must be distinguished from adoption by contract, deed, or notarial act, a process recognized by statute in some jurisdictions. Where such methods of adoption are legislatively sanctioned, they result in a legal adoption status that is no different from the status that arises from a decree of adoption in a judicial proceeding. 2 Am.Jur.2d, *Adoption, supra,* § 43 at 918. Equitable adoption, on the other hand, "is never viewed as the equivalent of a formal adoption, in terms of establishing a parent-child relationship, and is merely a status invented by courts of equity as a means of allowing a child in an appropriate case to enjoy part of the advantage of adoptive status." 18 Proof of Facts 2d, *Equitable Adoption* § 1 at 543 (1979).

■ [¶ 12] The elements of equitable adoption are (1) an implied or express agreement to adopt the child; (2) reliance on that agreement; (3) performance by the natural parents in giving up custody; (4) performance by the child in living in the home of, and in acting as the child of, the adoptive parents; (5) partial performance by the foster parents in taking the child into their home and treating the child as their child; and (6) the intestacy of the foster parents. *Lankford v. Wright*, 347 N.C. 115, 489 S.E.2d 604, 606–07 (1997); 2 Am.Jur.2d, *Adoption, supra,* § 54 at 932–33. In granting summary judgment to Neil J. and Charles, the district court made no findings of fact in regard to any of these elements. Instead, summary judgment was granted on the ground that Wyoming has not recognized equitable adoption. In this situation, we will assume that the facts favor Kirk and Kim, as the opponents of summary judgment, although we are troubled by the lack of verified facts in the record.

[¶ 13] The majority of states recognize equitable adoption in one form or another, although the doctrine has been explicitly rejected in others.[9] Almost exclusively, the application of the doctrine has been limited to intestate estates. *See, for example, Calista Corp. v. Mann*, 564 P.2d 53, 61 (Alaska 1977); *Estate of Wilson*, 111 Cal.App.3d 242, 168 Cal.Rptr. 533, 534 (1980); *Barlow v. Barlow*, 170 Colo. 465, 463 P.2d 305, 306 (1969); *Miller v. Paczier*, 591 So.2d 321, 322 (Fla.App.1991); *Roberts v. Caughell*, 65 So.2d 547, 547 (Fla.1953); *Franzen v. Hallmer*, 404 Ill. 596, 89 N.E.2d 818, 821 (1950); and *Lankford*, 489 S.E.2d at 607. It generally has not been applied to testate estates. *In re Estate of Wall*, 502 So.2d 531, 532 (Fla.App. 1987). *See also* Rebecca C. Bell, *supra,* XXIX Stetson L.Rev. at 435–39 (does not apply to testate estates, but only to intestate estates where the decedent's intent is unknown).[10] In addition, the doctrine is generally limited to the equitably adopted person's attempt to inherit from an intestate adoptive parent, and is not used to enforce the right of the adoptee to inherit from collateral kindred nor to enforce the right of collateral kindred to inherit from the adoptee. *Heien v. Crabtree*, 369 S.W.2d 28, 30 (Tex.1963); Stanley P. Atwood, Comment, *Virtual Adoption and Rights of Inheritance*, XXI Wash. & Lee L.Rev. 312, 317 (1964).

[¶ 14] Wyoming has not incontrovertibly recognized equitable adoption, even in intestate estates. Three cases, however, deserve mention because they touch on similar or related issues. In *Nugent v. Powell*, 4 Wyo. 173, 33 P. 23, 24 (1893), the mother of a child who had been abandoned by the father consented to the child's adoption by a childless couple. Statutory adoption was pursued to completion, with the exception of the probate court's failure to enter the adoption order of record. *Id.* at 25. Upon the intestate death of the adoptive father subsequent to the death of the adoptive mother, the siblings of the deceased adoptive father sought distribution of his estate to themselves, claiming that the child's adoption was ineffective. This Court reversed the district court's decree favoring the deceased's siblings on the ground that there had been substantial compliance with the adoption statutes. *Id.* at 25.

[¶ 15] *Nugent* has been cited for the following proposition:

> The equitable adoption doctrine first appeared in the late nineteenth and early twentieth centuries in Missouri and Wyoming when these two pioneer states held that an agreement to adopt that did not fulfill the statutory provision of adoption could be enforced under the principles of equity.

9. *See* 2 Am.Jur.2d, *Adoption, supra,* § 53 at 931–32 n. 10 n.13; George A. Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 97 A.L.R.3d 347, § 3, 359–66 (1980); Rebecca C. Bell, *supra,* XXIX Stetson L.Rev. at 417 n. 12; Beth Ann Yount, Note, *Lankford v. Wright: Recognizing Equitable Adoption in North Carolina*, 76 N.C. L.Rev. 2446, 2446 n. 5 (1998); and J.C.J., Jr., Note, *Equitable Adoption: They Took Him Into Their Home and Called Him Fred*, 58 Va. L.Rev. 727, 727–28 n. 7 and n. 10 (1972).

10. *But see Thomas v. Malone*, 142 Mo.App. 193, 126 S.W. 522, 523–24 (1910), where an equitably adopted child was allowed to pursue a claim against a will as a pretermitted heir. Further, some courts have begun to apply the doctrine to other claims, such as life insurance benefits, inheritance tax considerations, wrongful death actions, worker's compensation benefits, child support, and will contests. George A. Locke, *supra,* 97 A.L.R.3d at 353.

Beth Ann Yount, Note, *Lankford v. Wright: Recognizing Equitable Adoption in North Carolina*, 76 N.C. L.Rev. 2446, 2455 (1998) (footnotes omitted). Our reading of *Nugent* leads us to the considerably more limited conclusion that the case merely stands for the proposition that substantial, rather than absolute, compliance with the adoption statutes is sufficient to create a legal adoption. The emphasis in *Nugent* is upon legal adoption under a statutory scheme, not equitable adoption based upon an agreement.

[¶ 16] Commentators have noted that courts have not always done well at distinguishing between contracts to adopt and contracts to make a will or leave an inheritance:

> The courts often speak in terms of specific performance of the contract to adopt. In according this remedy courts have sometimes failed to distinguish between a contract to leave a child's share of the adopting parent's estate to the adopted child—which of course limits the right of the adopting parent to dispose of his estate by will—and a contract to adopt, *i.e.*, to comply with the statutory adoption procedure. The latter type of contract leaves the adopting parent free to disinherit the adopted child just as he could disinherit a natural child.

Edward D. Bailey, *Adoption "By Estoppel*,*"* 36 Tex. L.Rev. 30, 32–33 (1957); *see also* J.C.J., Jr., Note, *Equitable Adoption: They Took Him Into Their Home and Called Him Fred*, 58 Va. L.Rev. 727, 729–30 (1972) ("Of course, a single case may involve both a contract to make a will and a contract to adopt, and courts sometimes fail to distinguish between them; but the essence of equitable adoption is the provision of a judicial remedy for an unperformed adoption agreement.") (footnote omitted).

[¶ 17] *Pangarova v. Nichols*, 419 P.2d 688 (Wyo.1966), is just such a case, largely because the parties, long before the matter got to court, blurred the distinctions between adoption and inheritance. In *Pangarova*, a man and his wife wrote numerous letters to their adult niece in Bulgaria, offering to adopt her and to make her their heir if she would come to Casper, Wyoming, to live with them. *Id.* at 690. The niece eventually did come to Casper and moved into the home of her uncle and his new wife, his first wife having died. *Id.* And the uncle did, indeed, make a will naming his niece as the sole beneficiary of his estate. *Id.* at 690–93. Unfortunately, the niece and the new wife did not get along, the niece moved out, and the uncle drafted a new will leaving everything to his new wife. Upon the uncle's death, the niece filed an action seeking damages for breach of the contract to adopt her and to make her an heir. *Id.* at 693–94.

[¶ 18] The district court directed a verdict against the niece. In reversing and remanding for a new trial, this Court emphasized that the alleged contract did not deal solely with adoption, but promised that the uncle would make the niece his heir. We concluded that "[s]uch contracts are not uncommon in the case of minor children and are 'generally construed to impose upon the adoptive parent an obligation to make the child an heir, which equity will specifically enforce.' " *Id.* at 695 (*quoting* R.P. Davis, Annotation, *Specific Performance of, or Status of Child Under, Contract to Adopt Not Fully Performed*, 171 A.L.R. 1315, 1318 (1947)). This quoted language, taken from an annotation concerning enforcement of a contract to adopt, appears to be at least an indirect acceptance of the concept of equitable adoption. However, the quoted language is followed immediately in the opinion by this sentence: "Our difficulty here is that an adult is involved." *Pangarova*, 419 P.2d at 695. Thereafter, we pursued neither that general issue—adoption of an adult—nor the specific issue of equitable adoption of an adult. Instead, we cited several cases where the contract being enforced in equity was not simply a contract to adopt, but also contained a promise to make the adoptee an heir. *Id.* at 695–96.[11]

[¶ 19] On appeal after retrial, a jury verdict in favor of the niece was affirmed.

---

11. *Hicks v. Simmons*, 271 F.2d 875, 877 (10th Cir.1959) (oral promise to adopt and to leave adopting parents' property to adoptee); *In re Gary's Estate*, 69 Ariz. 228, 211 P.2d 815, 818 (1949) (oral promise to feed, clothe, educate, and make heir); *Foster v. Cheek*, 212 Ga. 821, 96 S.E.2d 545, 546–50 (1957) (oral promise to adopt and to make heir to inherit as natural child); *Fredrick v. Christensen*, 73 S.D. 130, 39 N.W.2d 529, 531–32 (1949) (legal adoption coupled with

*Nichols v. Pangarova*, 443 P.2d 756 (Wyo. 1968). While reference is made in the second opinion to "a contract that decedent would adopt her and make her his heir," the concept of equitable adoption is not directly discussed. *Nichols*, 443 P.2d at 758. Instead, the discussion focuses on "a contract to devise or bequeath property," "an oral contract to make a will," and "an agreement to will property." *Id.* at 759, 761 and 762. In the final analysis, *Pangarova* is fundamentally not an equitable adoption case.

[¶ 20] One other Wyoming case must be mentioned. We have already cited *Matter of Adoption of AMD*, 766 P.2d at 552, for the proposition that substantial compliance with the adoption statutes is required for a legal adoption to occur. The case also holds as follows:

> Adoption in Wyoming is a statutory proceeding and cannot be accomplished by private contract. It is held that: "If the relation of adoptive parent and child cannot be created by a private contract, it is equally certain that it cannot arise by estoppel."

*Id.* at 554 (*quoting* 2 Am.Jur.2d, *Adoption*, § 8 (1962)). Upon first reading, this language might appear to be an outright renunciation of the concept of equitable adoption (adoption by estoppel), but the facts and procedural status of the case indicate otherwise. The appellant had filed a petition to adopt his fiancée's two children. After the couple married, a decree was entered purporting to be a final decree of adoption. The couple soon separated, however, and the appellant filed a petition to have the adoptions vacated. He contended that the adoptions had been granted without compliance with statutory mandates.[12] *Matter of Adoption of AMD*, 766 P.2d at 551–52.

[¶ 21] The district court held that the appellant was estopped from contesting the validity of the adoptions because he had invoked the jurisdiction of the court, because he had failed to show material misrepresentations, and because it was in the best inter-

ests of the children that the adoption be confirmed. *Id.* at 552. This is the context in which this Court, in agreeing with the appellant, held that the legal status of adoption may only be created by statutory compliance, and that estoppel cannot be applied to avoid statutory mandates. *Id.* at 553–54. Clearly, that holding had nothing to do with the traditional concept of utilizing equitable adoption to protect a promised inheritance in an intestate estate.

[¶ 22] *Matter of Adoption of AMD*, like *Nugent* and *Pangarova*, left considerable doubt as to the status of equitable adoption in Wyoming. Because the instant case also fails to resemble the typical situation in which the doctrine is applied, it will have the same effect. If Neil had died intestate, Wyo. Stat. Ann. § 2–4–101(c)(i) (LexisNexis 2003) would apply and his estate would have gone "[t]o his children surviving, and the descendents of his children who are dead. . . ." The "simple" question then would be whether to apply equitable adoption so that Julie would be considered Neil's child for purposes of intestate succession. But that is not the question that is being asked in this case. Neil *did* leave a will and he *did* make Julie a beneficiary. Consequently, this case is quite unlike the usual equitable adoption case because its focus is not upon enforcing specific performance of a contract. Instead, its focus is upon statutory construction.

[¶ 23] Neither party presented this case below as a question of statutory construction, so the district court made no findings and reached no conclusions in that regard. However, "[i]f the evidence in the record supports the summary judgment granted by the district court on any legal basis . . . we will affirm." *Grose v. Sauvageau*, 942 P.2d 398, 402 (Wyo.1997). Because the inter-related issues of adoption and the distribution of decedents' estates are purely statutory, we must apply our standard rules of statutory construction to the questions before us.[13] We recently reiterated those rules at length:

---

12. The children had not lived in his home for six months, as required by Wyo. Stat. Ann. § 1–22–111(a)(iii) (W.S.1977).

13. The adoption statutes and the probate code must be read together to determine legislative

promise to make heir); *In re McLean's Estate*, 219 Wis. 222, 262 N.W. 707, 708 (1935) (no adoption promised, but oral promise to provide in will).

"This court interprets statutes by giving effect to the legislature's intent.... We begin by making an inquiry relating to the ordinary and obvious meaning of the words employed according to their arrangement and connection.... We give effect to every word, clause, and sentence and construe together all components of a statute *in pari materia.* ... Statutory interpretation is a question of law.... We review questions of law de novo without affording deference to the district court's decision."

*Worcester v. State,* 2001 WY 82, ¶ 13, 30 P.3d 47, 52 (Wyo.2001). If a statute is clear and unambiguous, we simply give effect to its plain meaning.... Only when we find a statute to be ambiguous do we resort to the general principles of statutory construction.... An ambiguous statute is one whose meaning is uncertain because it is susceptible to more than one interpretation....

"It is a basic rule of statutory construction that courts may try to determine legislative intent by considering the type of statute being interpreted and what the legislature intended by the language used, viewed in light of the objects and purposes to be accomplished.... Furthermore, when we are confronted with two possible but conflicting conclusions, we will choose the one most logically designed to cure the mischief or inequity that the legislature was attempting to accomplish."

*In re Collicott,* 2001 WY 35, ¶ 9, 20 P.3d 1077, 1080 (Wyo.2001). We presume that statutes are enacted by the legislature with full knowledge of existing law, so we construe statutes in harmony with existing law, particularly other statutes relating to the same subject or having the same purpose....

Statutes must be construed so that no portion is rendered meaningless.... Interpretation should not produce an absurd result.... We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole.... Each word of a statute is to be afforded meaning, with none rendered superfluous....

intent. *In re Cadwell's Estate,* 26 Wyo. 412, 186

Further, the meaning afforded to a word should be that word's standard popular meaning unless another meaning is clearly intended.... If the meaning of a word is unclear, it should be afforded the meaning that best accomplishes the statute's purpose.... We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another.... If two sections of legislation appear to conflict, they should be given a reading that gives them both effect.

*Rodriguez v. Casey,* 2002 WY 111, ¶¶ 9–10, 50 P.3d 323, 326–27 (Wyo.2002). In addition, it is a well-known principle of law that courts are not free to legislate. The first rule of statutory construction is that legislative intent, not a court's perception of fairness, controls. *State Dept. of Revenue and Taxation v. Pacificorp,* 872 P.2d 1163, 1166 (Wyo. 1994); *Olheiser v. State ex rel. Wyoming Workers' Compensation Div.,* 866 P.2d 768, 770 (Wyo.1994). It is not the court's prerogative to usurp the power of the legislature by deciding what should have been said. *Barber v. State Highway Commission,* 80 Wyo. 340, 342 P.2d 723, 725 (1959). The courts must follow, and cannot extend, statutory definitions. *State v. Weeden,* 17 Wyo. 418, 100 P. 114, 115 (1909). For over a century, Wyoming courts have recognized that it is their duty only to interpret and declare what the law is, not to be responsible for its defects. *Hamilton v. Territory of Wyoming,* 1 Wyo. 131, 135 (1873). And of specific importance to the instant case is the precept that exceptions not made by the legislature in a statute cannot be read into it. *State ex rel. Peterson v. Ellsworth,* 59 Wyo. 288, 139 P.2d 744, 748 (1943). Courts should be particularly chary of applying equity to negate statutory intent. Equity "arose in response to the restrictive and inflexible rules of the common law, and not as a means of avoiding legislation that courts deemed unwise or inadequate." *Lankford,* 489 S.E.2d at 608 (Mitchell, C.J., dissenting).

A court of equity has no more right than has a court of law to act on its own notion of what is right in a particular case; it must be guided by the established rules

P. 499, 500 (1920).

and precedents. Where rights are defined and established by existing legal principles, they may not be changed or unsettled in equity. A court of equity is thus bound by any explicit statute or directly applicable rule of law, regardless of its views of the equities.

*Id.* (*quoting* 27A Am.Jur.2d, *Equity* § 109 (1994)).

[¶ 24] Kim and Kirk oversimplify the task presented to this Court. They argue, correctly, that the question is whether their mother should be considered Neil's adopted daughter for purposes of the anti-lapse statute. But they incorrectly characterize that statute as allowing the "children" of a predeceased "family member" to take the share of an estate that was bequeathed to the deceased family member under a will, but denying such treatment to "non-family members." If that were the question, we would only have to determine whether Julie was a "family member." But the statutory construct is much more complex than that.

[¶ 25] Neil left the residuary portion of his estate to Julie, Neil J., and Charles. Julie died before Neil did. As applied to the facts of this case, Wyo. Stat. Ann. § 2–6–107(b) provides that, if Julie's residuary devise lapsed, then the entire residue is to be divided equally between Neil J. and Charles. Whether or not the devise to Julie lapsed depends on Wyo. Stat. Ann. § 2–6–106, which provides, in effect, that if Julie is a lineal descendent of Neil's grandparent, the residuary devise to her did not lapse, and her share will go to Kim and Kirk. The question is whether the legislature intended that result.

[¶ 26] The phrase "lineal descendent" is not defined in the statute. The word "lineal" connotes "a direct blood relative," and "lineal descent" indicates "[d]escent in a direct or straight line, as from father or grandfather to son or grandson." *Black's Law Dictionary* 456, 941 (7th ed.1999). "Lineal descent" is contrasted with "collateral descent,"

which refers to "descent in a collateral or oblique line, from brother to brother or cousin to cousin." *Id.* at 456. "With collateral descent, the donor and donee are related through a common ancestor." *Id.*

[¶ 27] The problem in the instant case, of course, is not that Julie was Neil's collateral relative. The problem is that Julie was not the lineal descendent of Neil's grandparent either biologically or by legal adoption. Legislative intent is certainly clear that, had Julie been adopted, she would be considered Neil's child, and would then be a lineal descendent under the statutes. Wyo. Stat. Ann. § 1–22–114(b) (LexisNexis 2003). But, on its face, the anti-lapse statute just as clearly makes no provision for step-children or other persons who have not been legally adopted. And in that regard, the words of the statute are not ambiguous. A lineal descendent is a lineal descendent. We cannot create an ambiguity within the statute by asking whether we should apply an equitable doctrine to broaden the class of persons identified by the statute.[14]

[¶ 28] The primary function of equitable adoption is to enforce a child's right to inherit from someone who promised, but failed, to adopt that child, and then died intestate. Because the putative adoptive parent died without a will, there was neither a testamentary inheritance nor a testamentary disinheritance, either of which was an available option for the decedent (unless there was also a specific promise to make a will or leave an inheritance). Equitable adoption is used to fill that intent "gap" by allowing the child to inherit as if she had been adopted. Where a will has been made, however, there is no gap to be filled. We know the decedent's intent from the terms of the will. In the instant case, we do not need equitable adoption to enforce Neil's intent to leave a portion of his estate to Julie—Neil did that himself in his will.[15]

[¶ 29] This case serves as a good example of why the doctrine of equitable adoption should not be applied to testate estates—the

---

14. That was the point of Chief Justice Mitchell's dissent in *Lankford*, 489 S.E.2d at 608.

15. Alternatively, what Kim and Kirk are asking this Court to do is to presume that Neil made his

will in ignorance of the adoption statute and in ignorance of the anti-lapse statute, and that he actually intended a result opposite from the statutory results. There is no evidence to support that theory.

result may negate both legislative and testamentary intent.[16] The specific facts of this case also raise another consideration: when the child seeking recognition of adoptive status is a step-child brought into the home by the marriage of her mother to the putative adoptive father, the inference does not necessarily follow that there was a promise to adopt. A court may infer such a promise in cases where biological parents relinquish their child to others. The same inference may not be appropriate, however, when a mother brings her child into the home of her new husband. In that situation, there may be an equal inference that the father-child or stepfather-stepchild relationship merely arose out of the domestic status of the parties. J.C.J., Jr., Note, *supra*, 58 Va. L.Rev. at 737–38; George A. Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 97 A.L.R.3d 347, § 26 at 65–67 (June 2003 Supp.). *See also*, Rebecca C. Bell, *supra*, XXIX Stetson L.Rev. at 430 and George C. Sims, Comment, *Adoption by Estoppel: History and Effect*, XV Baylor L.Rev. 162, 168–69 (1963).

As for the stepparent-stepchild relationship in this case, that relationship calls for particular circumspection before recognizing an equitable adoption. Courts have seldom applied the doctrine of equitable adoption or its equivalents to treat a stepparent as an adoptive parent.... One reason is the appreciation that it is in the public interest for stepparents to be generous and loving with their stepchildren. Such conduct could be discouraged if a consequence of such kindness toward a stepchild would be the imposition on the stepparent of the legal incidents of parenthood, such as a duty to provide child support after divorce or a reallocation of the stepparent's estate after death.

*Otero v. City of Albuquerque*, 125 N.M. 770, 965 P.2d 354, 362 (App.1998).

[¶ 30] Finally, although it is part of the probate code chapter dealing with intestate succession, Wyo. Stat. Ann. § 2–4–104 (LexisNexis 2003) should also be considered when determining the intent of the legislature as to the inheritance rights of children who have not been legally adopted: "Persons of the half-blood inherit the same share they would inherit if they were of the whole blood, but stepchildren and foster children and their descendents do not inherit."

### TESTAMENTARY INTENT

[¶ 31] In their second issue, Kim and Kirk contend that the district court erred in concluding that Neil's will did not evidence an intention that their mother's share of his estate should go to them. They argue that, even if the anti-lapse statute does not preserve the devise to her, this Court should give effect to Neil's intention, as provided by Wyo. Stat. Ann. § 2–6–105 (LexisNexis 2003):

The intention of a testator as expressed in his will controls the legal effect of his dispositions. The rules of construction expressed in the succeeding sections of this article apply unless a contrary intention is indicated by the will.

We note that Wyo. Stat. Ann. § 2–1–102(a)(ii) (LexisNexis 2003) also emphasizes the importance of testamentary intent:

(a) This code shall be liberally construed and applied, to promote the following purposes and policies to:

. . .

(ii) Discover and make effective the intent of a decedent in distribution of his property[.]

[¶ 32] Before we address the parties' arguments as to testamentary intent, we will briefly review our standards for the construction of wills. Consistent with the above statutory directives, "the intention of the testator must govern." *Hammer v. Atchison*, 536 P.2d 151, 155 (Wyo.1975). Furthermore, the intent of the testator must be ascertained solely from the meaning of the words used in the will. *Churchfield v. First Nat. Bank of Sheridan*, 418 P.2d 1001, 1003 (Wyo.1966); *In re Boyd's Estate*, 366 P.2d 336, 337 (Wyo.1961). Where the will is clear and unambiguous, the court may not read into a will something the testator did not place there. *Dainton v. Watson*, 658 P.2d 79, 81 (Wyo.1983); *Kortz v. American Nat. Bank of Cheyenne*, 571 P.2d 985, 987 (Wyo.1977). The courts will not supply words for the

---

**16.** We are not herein determining whether equitable adoption may be applied in an intestate setting. Wyo. Stat. Ann. § 2–1–102(b) (LexisNexis 2003) allows for the appropriate exercise of equity in a probate case: "Unless displaced by the particular provisions of this code, the principles of law and equity supplement the code provisions." *See Calista Corp.*, 564 P.2d at 61 n. 18.

testator. *In re Lendecke's Estate,* 79 Wyo. 27, 329 P.2d 819, 822 (1958). Wyo. Stat. Ann. § 2–6–112 (LexisNexis 2003), which requires wills to be in writing, precludes ascribing to a testator any intention not expressed in the instrument itself. *Churchfield,* 418 P.2d at 1003; *In re Boyd's Estate,* 366 P.2d at 337.

[¶ 33] In granting summary judgment to Neil J. and Charles on this issue, the district court made the following findings:

The Last Will and Testament of Neil Adam Seader is clear and unambiguous. Based on the clear and unambiguous language of the Last Will and Testament there is no indication that it was the decedent's intention to have Ms. Schroeder's children inherit the share Ms. Schroeder would have inherited had she survived the decedent. To the contrary, such a provision is nowhere to be found within the Last Will and Testament.

[¶ 34] The argument of Kim and Kirk that Neil intended for them to take their mother's share of his estate is contained in one paragraph of their appellate brief:

Under the will, Neil Adam Seader left the residue of his estate to three individuals. The will does not identify the relationship of any of these individuals to the testator and the testator made no distinction between them in the residuary clause. This evidences an intention that these three individuals be treated identically under the residuary clause. In the specific bequest clause, the testator left his coins to the same three individuals equally, "share and share alike." Again, evidence of an intention that these three be treated equally. Finally, in the specific bequest clause, Julie Schroeder is given a Thomas Organ but the decedent's two biological sons are given nothing additional. If this adds anything to the testator's intentions about Julie Schroeder, it is that she should be given preference over the biological sons—certainly not treated worse.

[¶ 35] The specific provisions of the will upon which this argument is based read as follows:

SECOND: (SPECIFIC BEQUESTS) I make the following specific bequests: (1) my Thomas Organ to Julie Schroeder; (2) the sum of $500.00 to Ronald Bathrick. Also, (3) my coins in the safe deposit box to be divided equally among Charles Lee Seader, Neil J. Seader and Julie L. Schroeder, share and share alike.

THIRD: All the rest, residue and remainder of my property, of every nature and description, real, personal or mixed, wheresoever the same may be situate, and whether acquired before or after the execution of this Last Will and Testament, and including is [sic] such rest, residue and remainder, any property over which at the time of my death I shall have the power of testamentary disposition, is directed to be sold and I give, bequeath and devise the proceeds to [be] divided to:

Neil J. Seader          Charles Lee Seader          Julie L. Schroeder
[Address]               [Address]                   [Address]

[¶ 36] We agree with the district court that these provisions are clear and unambiguous and that they simply do not contain any hint of an intention on Neil's behalf that the bequest and devise to Julie should be exempt from the anti-lapse statute. The will does not even refer to Julie as "my child" or to Julie, Neil J., and Charles as "my children." There is nothing within the language of the will from which we can infer that Julie was intended to be considered a "lineal descendent." It must be remembered that we cannot create an ambiguity within the will by application of the knowledge that Neil did not adopt Julie or by the assertions of others that he had allegedly previously intended to adopt her.

[¶ 37] Even if we were to accept the contention that, at the time of his marriage to Julie's mother, Neil agreed to adopt Julie, that adds nothing to our assessment of Neil's testamentary intent. An adopted child, like a natural child, could have been left out of the will altogether. We would have to speculate to conclude that, because Neil included Julie in his will, he meant for the gifts to her to pass to her children if she predeceased him. Such speculation is simply not justified;

the terms of the will and the statutory provisions are equally unambiguous.

## CONCLUSION

[¶ 38]   We decline to apply the doctrine of equitable adoption to affect the distribution of a testate estate.   Equity should not be available to countermand clear legislative mandates.   Adoption and probate are both statutory procedures, with formalities designed to ensure certainty.   Where neither the applicable statutes nor the last will and testament are ambiguous, neither legislative intent nor testamentary intent depend upon resort to equity.   Furthermore, there is no language within the unambiguous Last Will and Testament of Neil Adam Seader from which we can discern an intent that the provisions of Wyo. Stat. Ann. §§ 2–6–106 and 2–6–107 not apply to the testamentary gift to Julie L. Schroeder.

[¶ 39]   The district court's Order Granting Summary Judgment and Order Approving Accounting, and Decree of Distribution are affirmed.

GOLDEN, J., dissenting, with whom HILL, C.J., joins.

[¶ 40]   Because I believe there is room for equity under the unique facts of this case, I dissent.   With regards to the first issue, the application of the principles of equity to these facts, I disagree with the reasoning of the majority opinion.   The Wyoming Probate Code specifically provides that principles of equity should be applied to supplement Code provisions to the extent the equitable principles do not directly contradict express probate provisions.   Wyo. Stat. Ann. § 2–1–102(b) (LexisNexis 2003).   The majority opinion finds such an express contradiction where I believe none exists.   The majority opinion relies heavily on a dissent in a North Carolina intestate succession case to support its reasoning, *Lankford v. Wright,* 347 N.C. 115, 489 S.E.2d 604, 607 (1997).   In *Lankford,* the North Carolina Supreme Court recognized and applied the doctrine of equitable adoption under a more standard set of facts,

ultimately allowing a woman to inherit from the intestate estate of a woman who had held her out as her child.   *Id.* at 606–07.

[¶ 41]   The dissent in the North Carolina case was based upon a statute that is substantially different from Wyoming's statutes.   The North Carolina statute, included in the provisions governing intestate succession, provided that a person **adopted in accordance with the adoption statutes** is entitled by succession to any property by, through and from his adoptive parents.[1]   The dissent argued that the statute evinced a legislative policy decision that **only** those children legally adopted could inherit.   *Id.* at 608.   Continuing this line of reasoning, the dissent interpreted the statute as a legislative mandate precluding the application of equitable adoption by courts for purposes of intestate succession.

[¶ 42]   The majority in *Lankford* refused to accept the reasoning of the dissent, stating:

> [W]e again note that an overwhelming majority of states that have addressed the question have recognized and applied the doctrine [of equitable adoption].   More importantly, it is the unique role of the courts to fashion equitable remedies to protect and promote the principles of equity such as those at issue in this case.   We are convinced that acting in an equitable manner in this case does not interfere with the legislative scheme for adoption, contrary to the assertions of the dissent.   Recognition of the doctrine of equitable adoption does not create a legal adoption, and therefore does not impair the statutory procedures for adoption.

*Lankford,* 489 S.E.2d at 607.   I believe that the majority in *Lankford* has the better argument, especially concerning the role of equity and the courts.   Equity is always available, and indeed is intended, to fill gaps in compliment with the law, whether common law or statutory law.

---

1.   N.C. Gen.Stat. § 29–17 (2001).   Succession by, through and from adopted children

   (a) A child, adopted in accordance with Chapter 48 of the General Statutes or in accordance with the applicable law of any other jurisdiction, and the heirs of such child, are entitled by succession to any property by, through and from his adoptive parents and their heirs the same as if he were the natural legitimate child of the adoptive parents.

Equity follows the law except in those matters which entitle the party to equitable relief, although the strict rule of law be to the contrary. It is at this point that their paths diverge. As the archer bends his bow that he may send the arrow straight to the mark, so equity bends the letter of the law to accomplish the object of its enactment.

*Holloway v. Jones,* 246 S.W. 587, 591 (Mo. 1922). A reading of the Wyoming Probate Code as a whole reveals that the legislature intends and expects Wyoming courts to apply equity when necessary to "discover and make effective the intent of a decedent in distribution of his property." § 2–1–102(a)(ii).

[¶ 43] Thus, equity may be applied when necessary unless prohibited by an express probate provision. The majority opinion finds such an express prohibition in the anti-lapse statute. To save a bequest from lapsing, the anti-lapse statute requires the deceased devisee be a lineal descendant. The majority opinion claims that the term "lineal descendant" is unambiguous and this Court cannot apply equity to "broaden the class of persons identified by the statute." "Lineal descendant" means no more, or less, than in a direct line, *e.g.* a child or grandchild. The definition of "child" remains to be supplied. In *In re Cadwell's Estate,* this Court quoted with approval a definition of "lineal descendant" that included "an adopted child." 26 Wyo. 412, 419–20, 186 P. 499, 501 (Wyo.1920). "Child" is defined by Wyo. Stat. Ann. § 2–1–301(v) (LexisNexis 2003) as including "an adopted child." No definition expressly states, or even implies, that the definition of "adopted child" is limited to a legally adopted child, to the exclusion of an equitably adopted child. As such, I see no direct conflict in reading "equitably adopted child" into the definition of lineal descendant.

[¶ 44] Which brings me back to the initial enquiry—should equity be applied to these facts? I would approach the question in a slightly different manner. Certainly this case does not present the standard set of facts for the application of equitable adoption. Because Neil died testate, equitable adoption in the traditional sense does not apply. The Wyoming Probate Code clearly directs that "[t]he intention of a testator as expressed in his will controls the legal effect of his dispositions." Wyo. Stat. Ann. § 2–6–105 (LexisNexis 2003). Thus, the critical inquiry is Neil's intentions as expressed in his will.

[¶ 45] In determining the intent of a testator, it is important to note that the Wyoming Probate Code is set up as an "opt out" code. In other words, the provisions of the probate code apply unless the testator evinces a contrary intention in the will. Thus, the anti-lapse statute automatically applies unless the testator indicates otherwise in his will. In this case, Neil's will provides no indication that he did not want the anti-lapse statute to apply. Thus, Neil's intent is for the anti-lapse statute to apply. There is no question that if one or both of the biological sons had predeceased their father, their heirs would have taken "in place" of the deceased devisee.

[¶ 46] It is critical to note that the anti-lapse statute is not a statute of devise, but rather only limits the conditions upon which an inheritance will lapse. The inheritance does not lapse if it is made to a lineal descendent. If made to a lineal descendant, the "issue of the deceased devisee take in place of the deceased devisee." Wyo. Stat. Ann. § 2–6–106 (LexisNexis 2003). Thus, Kim and Kirk are not attempting to inherit in their own name or in their own right; they will only take in the place of Julie. It is still Julie's inheritance that is at stake.

[¶ 47] Neil's will clearly indicated that he did want Julie to receive an inheritance from him. The question is: did he want her to receive the inheritance as his daughter or as a non-relative? The majority opinion decides the issue against Julie based upon the lack of any express language in the will referring to Julie as his daughter. I believe this oversimplifies the process. Neil never clarified anyone's status in his will. I believe this lack of clarification renders the terms of the will ambiguous.

[¶ 48] "[T]the construction of the will is to be resolved by determining the intent of deceased as such appears from a full and complete consideration of the entire will when read in the light of the surrounding circumstances." *Douglas v. Newell,* 719 P.2d 971, 973 (Wyo.1986). The circumstances in

this case indicate that Neil consistently treated and referred to Julie as his daughter. Julie was his wife's daughter. When Julie's mother died, she left her entire estate to Neil, leaving nothing to Julie. Then Neil executed his will, treating all three children equally in at least two provisions of the will, including the residuary clause. I believe the family context creates a strong implication that Neil considered Julie his daughter, thus creating an ambiguity in his will requiring extrinsic evidence to resolve his true intent.

[¶ 49] The complication in this case is that, even if Neil intended Julie to take as his daughter, Julie was never legally adopted by Neil. Julie is legally not a lineal descendant of Neil. I do not believe, however, that the inquiry is automatically at an end with the determination of Julie's legal status. This case is presented to this Court as a plea to recognize Julie as adopted in equity. If Julie is recognized as adopted in equity, for purposes of inheritance only, Julie would be a lineal descendant, her share would not lapse, and her children would take her share as her representatives. This, I believe, is where there is room for the application of equity to affect Neil's testamentary intent.

[¶ 50] This case was decided on summary judgment. I would reverse and remand this case for further proceedings to determine Neil's testamentary intent. Starting with his will, we know Neil wanted Julie to inherit from him, but we do not know from the will what status Neil accorded Julie. I believe the first issue to determine is if there is clear and convincing evidence to support equitable adoption. If there is not, the inquiry is at an end because Neil could not have considered Julie an adopted daughter. Julie's share would thus lapse.

[¶ 51] If there is clear and convincing evidence supporting equitable adoption, then the question returns to Neil's testamentary intent. Did Neil intend for Julie to take only if she survived him, or did Neil take for granted that Julie was his daughter and her inheritance would not lapse? If it can be proven that Neil did want Julie to take as his daughter, then I believe it would be appropriate to apply the principle of equitable adoption, thus preventing Julie's share from lapsing. This would then allow for Neil's testamentary intent to be fulfilled. Applying

principles of law and equity is exactly what this court is expected to do to "discover and make effective the intent of a decedent in distribution of his property." § 2–1–102(a)(ii).

[¶ 52] However, I note that many jurisdictions accept that "adoption by estoppel" precludes not just the foster parents but also their heirs from challenging the status of a child as equitably adopted. *See e.g. Shaw v. Scott*, 217 Iowa 1259, 252 N.W. 237 (Iowa 1934) (collecting cases); *Fiske v. Lawton*, 124 Minn. 85, 144 N.W. 455 (1913). In both *Shaw* and *Fiske*, the foster child predeceased the foster parents and the foster parents then died intestate. The respective courts, after finding clear and convincing evidence of an agreement to adopt, estopped the heirs of the foster parents from challenging the status of the foster child as equitably adopted, thus clearing the way for the foster child's children to inherit their parent's share.