1998-NMCA-137

965 P.2d 354

**John Christian OTERO,
Plaintiff–Appellant,**

v.

**CITY OF ALBUQUERQUE,
Defendant–Appellee.**

**No. 18172.**

Court of Appeals of New Mexico.

Aug. 27, 1998.

Lisa K. Vigil, Jacob Vigil, Vigil Law Firm, P.A., Albuquerque, for Plaintiff–Appellant John Christian Otero.

Robert M. White, City Attorney, Mark Hirsch, Assistant City Attorney, Albuquerque, for Defendant–Appellee City of Albuquerque.

OPINION

HARTZ, Chief Judge.

{1} Norman Otero was killed in an automobile accident on December 19, 1992. At the time of his death he was married to Jeannette Otero, the biological mother of John Christian Otero. Norman was neither the biological nor adoptive father of John. In her capacity as personal representative of Norman's estate, Jeannette brought a wrongful death claim against the City of Albuquerque and a number of other defendants. In addition, various relatives of Norman—including Jeannette—brought individual claims in the same complaint. In Count VI of the complaint, John sought damages for loss of guidance and counseling resulting from Norman's death. The City, which is the sole appellee on this appeal, moved for summary judgment on the claim, contending that John was not a son or relative of Norman. John responded that he had been "equitably adopted" by Norman prior to his death. The district court granted the City summary judgment with respect to the claim. John appeals. We affirm because the evidence would not support a determination that Norman equitably adopted John.

**FACTUAL BACKGROUND**

{2} John acknowledges that his claim can survive only if he was equitably adopted by Norman. On review of the summary judgment in favor of the City, we determine whether the evidence John presented in response to the motion for summary judgment, viewed in the light most favorable to his claim, could support a finding of such an equitable adoption. *See* Rule 1–056 NMRA 1998 (summary judgment rule); *Roth v. Thompson*, 113 N.M. 331, 334–35, 825 P.2d 1241, 1244–45 (1992). Accordingly, we will assume the truth of the allegations in an affidavit signed by Jeannette, which John submitted in opposition to the City's motion.

{3} The affidavit set forth the following: John was born on October 8, 1976. His biological parents were Elmo Baca and Jeannette. Jeannette and Baca were never married. Baca had no contact with John after he was approximately two years old. Jeannette married Norman Otero in May 1982, when John was 5½ years old. Since that time, and even for a while before then, Norman cared for and raised John with great love and affection. A few months after the marriage John was registered in kindergarten as "Jon Christian Otero" at Norman's insistence because of his desire to adopt John. When John turned sixteen he wanted to change his name formally to "John Christian Otero." This was accomplished by a court order on December 9, 1992, only ten days before Norman's death. *See* NMSA 1978, § 40–8–1 (1989) (permitting resident older than fourteen to petition for name change.) Norman performed the duties of a father, including coaching John's sports teams, leading John's 4–H activities, and attending teachers' meetings, first communion, and other important events in John's life. Norman held John out as his natural child and John recognized Norman's parents as his grandparents. In addition, at the hearing on the motion for summary judgment, John's attorney stated that he had an affidavit from John's biological father stating that he had not seen John since 1980, that he consented to the adoption, and that "by all rights, Norman Otero raised him and should be considered his father."

**DISCUSSION**

*Procedural Issue Not Decided*

{4} To avoid any implication to the contrary, we first emphasize that there is one issue of law that we are not deciding on this appeal—the proper procedure for a child to bring a claim of loss of guidance and counseling arising from the wrongful death of a parent. We note two possibilities. A child could, as John did here, bring a separate claim against the alleged tortfeasor, seeking damages that would be paid directly to the child. Alternatively, the loss of guidance and counseling could be included as part of the damages recoverable in a wrongful death action. In that event the child would recover his or her statutory fraction of the total recovery in the wrongful death action (without regard to the particular loss suffered by the child). *See* NMSA 1978, § 41–2–3 (1939). In *Romero v. Byers*, 117 N.M. 422, 424, 872 P.2d 840, 842 (1994), our Supreme Court held that "loss of consortium damages may not be awarded for spousal loss of consortium under

the New Mexico Wrongful Death Act .... [and a] loss of consortium claim is a separate cause of action to be brought by the spouse." On the other hand, with respect to loss by a minor child of guidance and counseling, the Court held that such loss "may be considered by a jury in fixing pecuniary loss to the survivors" and "[t]he jury should be allowed to assess this loss as part of the value of the decedent's life" in a wrongful death action. *Id.* at 428, 872 P.2d at 846. Perhaps John's separate cause of action is barred by *Romero*. But the City, which raised this issue in district court, has not pressed the issue on appeal, apparently contending that John should not be entitled to recover either under a separate cause of action or under the Wrongful Death Act.

*Equitable Adoption*

{5} Norman was not John's biological father, nor did Norman complete, or even initiate, the statutory procedure to adopt John. Nevertheless, John contends that he should be treated as Norman's son in this case because he was equitably adopted by Norman. Therefore, we must explore the doctrine of "equitable adoption."

■ {6} Adoption was unknown to the common law. *See In re Candelaria's Estate,* 41 N.M. 211, 216, 67 P.2d 235, 237–38 (1937); George C. Sims, Comment, *Adoption by Estoppel: History & Effect,* 15 Baylor L.Rev. 162, 162 (1963); Jess T. Hay & Ronald M. Weiss, Comment, *The Doctrine of Equitable Adoption,* 9 Sw. L.J. 90, 91 (1955). It is a creature of statute. *See* NMSA 1978, §§ 32A–5–1 to –45 (1993, as amended through 1997). In certain limited circumstances, however, courts have treated a person as an adoptive parent for some purposes despite failure to comply with statutory requirements. New Mexico is among the jurisdictions that have recognized "equitable adoption." *See generally* George A. Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel,* 97 A.L.R.3d 347 (1980). But the recognition has occurred only when strict requirements have been satisfied.

{7} The first New Mexico case in point was *Barney v. Hutchinson,* 25 N.M. 82, 177 P. 890 (1918). J.W. Barney and his wife, Annie C. Barney, entered into a written contract with Maud Benneson to adopt her child, Frank Byron Benneson, who was then less than two years old. Under the contract the Barneys agreed " 'to immediately adopt' " the child, to " 'assume all responsibility and care of said child,' and to 'educate and do for him in every respect as if he were their own offspring.' " *Id.* at 85, 177 P. at 890. The contract was filed with the probate clerk. *See id.* But the Barneys took no further action to adopt the child in accordance with statute. *See id.* at 86, 177 P. at 890. In all other respects, they complied with the contract. *See id.* The child was renamed Frank C. Barney. *See id.* at 85, 177 P. at 890. Frank married and had a child, Roxia Barney, but then was killed. *See id.* Annie Barney, who had divorced J.W. and then married George H. Hutchinson, survived him. When Annie died intestate, Frank's daughter Roxia sought a share of the estate. The district court held that she had no cause of action, but our Supreme Court reversed and remanded for trial. The Supreme Court cited authorities granting "specific performance" of contracts to adopt on the ground that "equity considers that done which ought to have been done." *Id.* at 89, 177 P. at 891. Reasoning "that equity and justice demand the specific performance of the contract, to the end that Frank C. Barney be adjudged the adopted son of Annie C. [Hutchinson]," *id.* at 93, 177 P. at 893, the Court held "that equity will consider that Frank C. Barney was in all respects the legally adopted son of the Barneys, and that the surviving spouse of Annie C. Hutchinson, as well as her collateral heirs, cannot be heard to dispute that which the ancestor would be estopped from asserting," *id.*

{8} The issue next arose in *Wooley v. Shell Petroleum Corp.,* 39 N.M. 256, 45 P.2d 927 (1935). After the death of the mother of six-year-old Cora Bradley and her two-year-old sister Clara, their father turned their care over to Mary L. Fowler and her husband, Pascal N. Fowler. Their father reached an oral agreement with the Fowlers that they " 'should take the children into their home and treat them in all respects as

their own children, and that they would legally adopt said girls, and at the death of the said Fowlers, they would leave to said children such property as they owned.'" *Id.* at 260–61, 45 P.2d at 930. The Fowlers fully complied with the agreement except that they did not legally adopt the girls. *See id.* at 261, 45 P.2d at 930. Although the Fowlers were called "uncle" and "aunt" by the girls, the girls were otherwise treated as if they were the Fowlers' own children. *See id.* In addition, "the Fowlers repeatedly stated in substance to numerous persons that [the two girls] were their adopted children and would inherit their property," *id.*, and the girls believed that themselves, *see id.* The issue at trial was the right of the girls to inherit from Mary L. Fowler, who left no will. Our Supreme Court ruled that "in contemplation of equity, the [two] girls were, from the moment of the decease of their mother by adoption, sole owners of the property as her heirs at law." *Id.* at 267, 45 P.2d at 934. The ground of relief afforded in *Barney* was one to which the Court was still committed, *see id.* at 261, 45 P.2d at 930, but the Court pointed out that "specific performance" was a misnomer in these circumstances, because specific performance of a contract to adopt is impossible after the death of the promisor, *id.* at 263, 45 P.2d at 931. Rather, it stated, it had employed the nomenclature of specific performance while indulging the fiction that there had been an adoption, *see id.* at 263–64, 45 P.2d at 931–32, and "the real classification of the remedy is that of estoppel," *id.* at 265, 45 P.2d at 932 (internal quotation marks and citation omitted). ("Estoppel precludes one party from asserting a right when another party has relied to his detriment upon the acts or conduct of the first party and when asserting that right would prejudice the other who has acted thereon in reliance." *Continental Potash, Inc. v. Freeport–McMoran, Inc.,* 115 N.M. 690, 697, 858 P.2d 66, 73 (1993).)

{9} Two years later, in *Candelaria,* the Supreme Court considered an appeal in which the facts did not support an equitable adoption. Juanita Candelaria de Lucero claimed that she should be treated as the adopted daughter of Juanita Candelaria (decedent), who was deceased. The claimant was the natural daughter of Sophia and Donato Duran. At the age of twelve, Sophia had been placed in Juanita's custody when Sophia's own mother died. *See Candelaria,* 41 N.M. at 212, 67 P.2d at 235. Even after Sophia's marriage to Donato, the couple continued to live with the decedent and decedent's mother, Trinidad Garcia Candelaria, for three years. They were all living together when the claimant's parents placed claimant under the care of Trinidad. *See id.* at 212–13, 67 P.2d 235, 67 P.2d at 235. The Court stated that "[t]he evidence supports the finding that there was a complete and absolute surrender of the child to Trinidad ." *Id.* at 213, 67 P.2d at 235. After Trinidad's death the claimant "continued to live with deceased, who treated her as a daughter, educated her, and supported her without aid from her natural parents. . . . The evidence fully supports the findings that the deceased treated [the claimant] in every way as a daughter, had great affection for her, referred to her as her adopted daughter, and repeatedly stated to her friends and neighbors that all of her property would go to the [claimant] at her death." *Id.* at 213, 67 P.2d at 236. Although both of the claimant's natural parents testified that there was "no agreement or contract of adoption" between them and the deceased, *id.* at 214, 67 P.2d at 236, the claimant contended that the behavior of the parties established that such a contract must have existed, *see id.*

{10} The Supreme Court rejected the contention. It recited that proof of the contract "must be so clear, cogent, and convincing as to leave no reasonable doubt as to its existence and terms." *Id.* at 214–15, 67 P.2d at 237 (internal quotation marks and citation deleted). It then held that the district court had erred in reversing the probate court and treating the claimant as an heir. The Court wrote:

The largess of the foster parent or the bestowal of a reward for services performed is not the same as the conferring of a right to inherit a child's part. . . .

The relinquishment of the control of the child by its parents, especially to a blood relative, is not tantamount to an agreement that the child may be adopted. The

mere fact that a child of another is received into a home, cared for, and educated cannot indicate that such a child has further claims upon those who took it in, and that there is an implied agreement to adopt the child.

*Id.* at 217–18, 67 P.2d at 238–39 (internal quotation marks and citation omitted). The Court ruled that "the probate court was right in holding that [the claimant] failed to establish the agreement to adopt by the character of evidence required under the rule hereinbefore stated." *Id.* at 218, 67 P.2d at 239. It also said that the claimant had "failed to show that it would be a fraud upon her not to enforce the alleged agreement of adoption." *Id.* at 218, 67 P.2d at 239. Noting that the claimant had profited by what the decedent had done for her and that she had sacrificed nothing by remaining with the decedent, the Court wrote, "Where the promisee shows no substantial change for the worse in his position in consequence of the agreement, relief will be denied." *Id.* at 219, 67 P.2d at 239 (internal quotation marks and citation omitted). This language illustrates, as stated in *Wooley,* 39 N.M. at 265, 45 P.2d at 932, that the equitable-adoption remedy is based on estoppel.

{11} Next, in *In re Garcia's Estate,* 45 N.M. 8, 107 P.2d 866 (1940), the Supreme Court reversed the district court, holding that the evidence of a contract to adopt was sufficient to withstand a motion to dismiss. The claimant, born Melinda Montoya, was seven years old when her mother died. Her father was serving a life sentence in the state penitentiary. She had lived with her paternal uncle for about four months when she was taken into the home of Marcelino and Kittura Garcia, who treated her as their own child. About two years later the claimant left the Garcias to return to her uncle. After a few days Marcelino Garcia retrieved her from the uncle's home. On that occasion the uncle said, "You must adopt her this time." Marcelino agreed. The Garcias treated her as a daughter, introduced her to others as their daughter or adopted daughter, and stated on occasion that they had adopted her with her father's consent. She went by the name "Melinda Garcia" on all occasions except when she applied for a marriage license

and the priest told her that she needed to use her christened name. *See id.* at 11–12, 107 P.2d at 868–69. The Supreme Court held that the evidence was sufficient to establish a contract for adoption and in particular "was sufficient to support an inference that the wife joined in the husband's commitment to adopt[.]" *Id.* at 15, 107 P.2d at 870.

{12} The most recent reference to the above-discussed doctrine in a reported New Mexico decision was almost 50 years ago. In *Mares v. Martinez,* 54 N.M. 1, 212 P.2d 772 (1949), the plaintiff sought a share of the testator's estate as a pretermitted child. The Court rejected the claim. But in its discussion the Court assumed that the plaintiff was testator's "child," while citing *Barney* and *Wooley* as contrary authority. *Mares,* 54 N.M. at 4, 212 P.2d at 773. The opinion contains no substantive discussion of the doctrine.

{13} These New Mexico opinions appear to be in line with the law elsewhere. Professor Rein has summarized as follows the law regarding when a foster child can inherit an intestate share of a foster parent's estate:

> The doctrinal heading under which courts grant this relief is variously called "equitable adoption," "virtual adoption," "de facto adoption," or "adoption by estoppel." No matter the label, ... unless the foster parent has made a substantial attempt to comply with formal adoption proceedings, a court will almost invariably condition the granting of relief on a showing that the foster parent agreed to formally adopt the foster child. The courts have traditionally limited the doctrine to narrow circumstances, reasoning that the adoption statutes are in derogation of the common law and thus provide the exclusive means for effecting an adoption or obtaining its benefits.

Jan Ellen Rein, *Relatives by Blood, Adoption, and Association: Who Should Get What and Why,* 37 Vand. L.Rev. 711, 767 (1984) (footnotes omitted).

{14} Under this test, there was no equitable adoption here. John has not suggested, much less proved, a contract between his natural father and Norman.

Nevertheless, the New Mexico authority is several decades old, and there have been many changes in the American family, and family law, during the past fifty years. It is therefore worthwhile to examine whether the restrictions on our recognition of equitable adoption can withstand modern scrutiny. In our view, although some modification to the requirement of a contract may be appropriate, strict limitations on recognition of equitable adoption remain justified. This conclusion follows from an appreciation of the virtues of requiring adoptions to be effected in accordance with statute.

■ {15} First, there are advantages to the formality of court-approved adoption pursuant to statute. The formality of the occasion impresses upon those involved the importance of making a considered decision. *See* Elizabeth A. Gaudio, Note, *Limiting the Scope of Equitable Adoption,* 54 Md. L.Rev. 822, 825, 831 (1995). To predicate an adoption on simply the existence of a loving relationship may often produce results contrary to the intent of those involved. As stated in *Candelaria:*

> "Can it be said that the mere fact that an orphan child, in indigent circumstances, was taken into the family of comparatively wealthy people, reared and educated even on an equality with their daughter, is reasonably consistent only with the theory that she was an adopted child—consistent [sic] only with the theory that at his death his own daughter should make equal division with her of the estate which was the product of his whole life's work? If that is so, how dare a man take such a child into his family?"

41 N.M. at 215, 67 P.2d at 237 (quoting *Wales v. Holden,* 209 Mo. 552, 108 S.W. 89, 96 (Mo.1908)). *Candelaria* represents a widely-held view. Professor Rein, explaining the requirement "that statements or conduct claimed to establish a contract to adopt must be unequivocally referable to such an agreement," stated: "Courts fear that if they relaxed the standard of proof a person could not help out a needy child without having a de facto adoption foisted upon him after death." Rein, *supra,* at 781–82.

■ {16} Such formality also provides some useful certainty in the law. If proof of a loving relationship can by itself entitle a person to the benefits of being a child under the law, one could anticipate frequent litigation in which parties dispute the intimacies of family life. Not only would such litigation often be destructive of familial relationships, it could significantly disrupt property transactions and estate planning. *Candelaria* recognized the latter problem. The district court had found

> "[t]hat it is the custom among the native people of this State to take children into their homes by and with the consent of their natural parents and care for, educate them, treat them as their own children, and to consider them as adopted children who would inherit as though they were their own children."

41 N.M. at 217, 67 P.2d at 238. Our Supreme Court commented: "If the trial court's finding quoted above should become the rule of decision in this jurisdiction, it would seriously affect the titles to real estate and introduce many elements of danger." *Id.*

■ {17} In addition, the statutory adoption procedure is designed to protect children from being adopted by unsuitable persons. *See* Rein, *supra,* at 774, 800–03; Harvey A. Schneider, Comment, *Equitable Adoption: A Necessary Doctrine?,* 35 S. Cal. L.Rev. 491, 497 (1962); Gaudio, *supra,* at 831. Ordinarily, except for stepparent adoptions, *see* § 32A–5–32, the New Mexico statute requires an evaluation of the suitability of the prospective adoptive parent and the home where the child will live. *See* §§ 32A–5–12 to –14. Unconstrained recognition of equitable adoption would undermine this legislative purpose, making compliance with statutory procedures unnecessary, and even unattractive, for prospective parents. Professor Rein has noted "the erosive effect that ... equivalent treatment of formal and informal adoptees may have on our formal adoption procedures." Rein, *supra,* at 800; *see id.* at 803; Gaudio, *supra,* at 825, 831.

■ {18} Finally, statutory adoption, as opposed to an informal procedure, clarifies the rights and obligations of the natural par-

ent who may be supplanted by the adoptive parent. *See* Gaudio, *supra*, at 825.

{19} These weighty considerations counsel caution in recognizing an equitable adoption. Perhaps, however, our Supreme Court today would not find it necessary to be as restrictive as it has been in the past, when it has required an actual contract of adoption between the equitable parent and the natural parents (or one standing in *loco parentis*, as in *Garcia's Estate* ). Other courts have not always been so restrictive, and commentators have recommended relaxation of the contract requirement, *see* Rein, *supra*, at 785–86; John Calvin Jeffries, Jr., Note, *Equitable Adoption: They Took Him Into Their Home and Called Him Fred*, 58 Va. L.Rev. 727, 736 (1972). Nevertheless, these authorities still keep equitable adoption bound to its moorings in the doctrine of estoppel, *see Wooley*, 39 N.M. at 265, 45 P.2d at 937, although the detrimental reliance ordinarily required for promissory estoppel can sometimes be satisfied simply by the emotional investment made between two persons who believe themselves to be parent and child, *see* Rein, *supra*, at 778–79. Professor Rein explains:

> In view of the artificiality of the contract requirement and its malleability to achieve whatever result the court desires, a more realistic guide would better serve both bench and bar. A better test for the meritoriousness of these claims is whether the foster parent led the child to believe that he was a biological or legally adopted member of his foster family. If estoppel is the true basis for the granting of equitable relief, whether or not a contract existed or even whether or not the foster parent intended to formally adopt the child should be beside the point. The courts should hold that the only finding essential to raise an estoppel is that the foster family's acts or omissions induced the child to believe that he was the foster parent's biological or formally adopted child.

*Id.* at 785–86 (footnote omitted). It is hard to see how anything less could justify overriding the requirements of the adoption statute.

■ {20} Yet, even if this more expansive notion of equitable adoption is accepted, two features of the present case argue against its application here: (1) the fact that the issue arises in a tort action against a third party and (2) the fact that Norman was John's stepfather. First, the tort aspect of the case. Because the doctrine of equitable adoption is founded on estoppel, recognition of an equitable adoption in a wrongful death case is problematic. One consequence of the estoppel nature of equitable adoption is that the equitably adopted child should not be treated as the legal child of the equitable parent for all purposes. *See* Schneider, *supra*, at 497–99; Rein, *supra*, at 805. Only one who has detrimentally relied can claim an estoppel, and only one who has caused the reliance can be estopped. *See Continental Potash*, 115 N.M. at 697–98, 858 P.2d at 73–74. For example, although the equitable parent's conduct may justify imposing a duty of child support on that parent, that conduct would not necessarily justify the child's receipt of an intestate share of the estate of the equitable parent's collateral relative, *see* Gaudio, *supra*, at 828, or the receipt by the child's biological relatives of a share of the estate of the equitable parent, *see* Jeffries, *supra*, at 738–43. (This point was not addressed in *Wooley*, which permitted, without discussion of the point, the natural father of a deceased equitably adopted child to recover an intestate share of the estate of an equitable parent. *See* Jeffries, *supra*, at 742 (discussing *Wooley* ).) As stated by Professor Rein:

> In evaluating the cases we must remember that equitable adoption is a remedy fashioned by equity and that the true basis of granting relief is that the parties against whom relief is sought have acted in such a way as to estop themselves from denying that they legally adopted the child. Therefore, theoretically it should follow that the test for all claims should be whether the party against whom the effects of legal adoption are sought has done anything to warrant the raising of an estoppel.

Rein, *supra*, at 788.

{21} How, then, can equitable adoption apply in a tort action against a stranger? Ordinarily, the conduct of an equitable parent could not estop a third party, particularly

one who could not be characterized as in privity with the equitable parent. Thus, whether to recognize an equitable adoption in an action for wrongful death could depend on the nature of the cause of action. If recognition of an equitable adoption does not affect the amount of the recovery from the tortfeasor but only how that recovery is distributed among the decedent's relatives, *see* § 41–2–3 (distribution of proceeds of wrongful-death judgment), the tortfeasor is unaffected by the recognition. *See* Jeffries, *supra*, at 744. The real dispute is among those claiming to be statutory beneficiaries of the decedent. There would be no reason to treat a claim of equitable adoption differently from how it would be treated in a contest over an intestate estate. But if the amount of the recovery against tortfeasors turns on whether an equitable adoption is recognized, the approach would have to be different. It would be rare for tortfeasors to have engaged in conduct that estopped them from pointing to the statutory requirements for adoption. *See* Rein, *supra*, at 796 ("[I]t seems doubtful that ... the wrongful death defendants would have done anything to warrant the raising of an estoppel against them."). Accordingly, recognition of an equitable adoption would seldom be appropriate in this context.

{22} As for the stepparent-stepchild relationship in this case, that relationship calls for particular circumspection before recognizing an equitable adoption. Courts have seldom applied the doctrine of equitable adoption or its equivalents to treat a stepparent as an adoptive parent. *See* Jeffries, *supra*, at 737–38. One reason is the appreciation that it is in the public interest for stepparents to be generous and loving with their stepchildren. Such conduct could be discouraged if a consequence of such kindness toward a stepchild would be the imposition on the stepparent of the legal incidents of parenthood, such as a duty to provide child support after divorce or a reallocation of the stepparent's estate after death. *See A.R. v. C.R.*, 411 Mass. 570, 583 N.E.2d 840, 843–44 (Mass.1992); *Miller v. Miller*, 97 N.J. 154, 478 A.2d 351, 357–59 (N.J.1984); *In re Marriage of Ulrich*, 168 Wis.2d 792, 484 N.W.2d 545, 548–49 (Wis.1992). Again, Professor Rein: "When the alleged adopter is the child's stepparent the courts almost invariably find the proof insufficient on the grounds that the conduct of the parties was as consistent with the normal stepparent-stepchild relationship as it was with the contract to adopt." Rein, *supra*, at 781–82; *see, e.g., Weidner v. American Family Mut. Ins. Co.*, 928 S.W.2d 401, 403 (Mo.Ct.App.1996) (wrongful death action). It appears that in most cases that have recognized equitable adoption by a stepparent, the child was conceived or born during the marriage to the stepparent. *See Perkins v. Perkins*, 34 Conn.Supp. 187, 383 A.2d 634, 635–37 (Conn.Super.Ct.1977); *Wade v. Wade*, 536 So.2d 1158 (Fla.Dist.Ct.App.1988); *In re Marriage of Gallagher*, 539 N.W.2d 479, 480 (Iowa 1995); *Van v. Zahorik*, 227 Mich.App. 90, 575 N.W.2d 566, 569, 571 (Mich.Ct.App. 1997); *T ... v. T ...*, 216 Va.867, 224 S.E.2d 148, 150 (Va.1976); *cf. In re Marriage of Johnson*, 88 Cal.App.3d 848, 152 Cal.Rptr. 121 (Cal.Ct.App.1979) (stepfather must pay support; marriage ten days after birth). In general, the courts require (1) a showing of some misrepresentation that the stepparent was a biological or adoptive parent, *see Wade*, 536 So.2d at 1160; *Marriage of Gallagher*, 539 N.W.2d at 481–82 (husband sought custodial rights; mother had misrepresented his paternity to husband); *Ross v. Ross*, 126 N.J.Super. 394, 314 A.2d 623 (N.J.Juv. & Dom.Rel.Ct.1973), *aff'd*, 135 N.J.Super. 35, 342 A.2d 566 (N.J.Super.Ct.1975), (2) a promise to support the child, *see Wright v. Newman*, 266 Ga. 519, 467 S.E.2d 533, 534–35 (Ga.1996) (child support case); *A.R.*, 583 N.E.2d at 844 (same); *Miller*, 478 A.2d at 358 (same); *T ...*, 224 S.E.2d at 151 (same); *Marriage of Ulrich*, 484 N.W.2d at 548 (same), or (3) conduct by the stepparent that would prevent the child or spouse from securing rights against the other biological parent, *see Wade*, 536 So.2d at 1160; *Wright*, 467 S.E.2d at 535; *A.R.*, 583 N.E.2d at 844; *Miller*, 478 A.2d at 359. *But cf. Pietros v. Pietros*, 638 A.2d 545, 548 (R.I.1994) (mother's decision to bear child resulted from equitable father's "assurances that he would assume the parental role").

{23} Turning to the facts of the present case, John has not established the

necessary factual basis for an equitable adoption, even under Professor Rein's test. Taking the assertions of Jeannette's affidavit as true, we acknowledge that Norman may have been an ideal stepfather. But there is no evidence of a contract to adopt or even that he or Jeannette misled John into believing that Norman was his biological or adoptive father. Indeed, the application for a name change suggests the contrary. Moreover, although Norman expressed an interest in adopting John shortly after the marriage, he never did so. Nothing in the record suggests that there were any substantial obstacles to such an adoption. Nor is there any evidence that Norman hindered in any way the opportunity for John to have a relationship with, or even obtain child support from, his biological father. The biological father apparently would have welcomed the relief from any potential parental responsibility. In short, the record here would not support an equitable adoption in any context, much less in the context of a tort action against a third party.

## CONCLUSION

{24} For these reasons, we affirm the summary judgment entered by the district court.

{25} **IT IS SO ORDERED.**

PICKARD and WECHSLER, JJ., concur.