2006-NMCA-013

126 P.3d 1221

**Ariel PONCHO, Petitioner–Appellant,**

v.

**James BOWDOIN, Respondent–Appellee,**

v.

**Jamie W. PONCHO, Third Party Respondent–Appellee.**

No. 25,100.

Court of Appeals of New Mexico.

Dec. 7, 2005.

David A. Standridge, Jr., Peter L. Robinson, Albuquerque, for Appellant.

James Bowdoin, Albuquerque, Pro Se Appellee.

Jamie W. Poncho, New Laguna, Pro Se Appellee.

## OPINION

SUTIN, J.

{1} In this case, the biological mother of a child sought and was denied child support from the biological father of the child. The biological mother and biological father were never married. The child was conceived after consensual sexual relations. The biological father prevailed under an equitable adoption theory through which the responsibility for child support was transferred to another person held, for the purposes of child support, to have adopted the child by his conduct and through agreement of the parties.

{2} This case requires Solomon's wisdom in deciding which father is obligated to pay child support. James Bowdoin's short-lived relationship created Child. Following that, Bowdoin performed no parental duty except, perhaps, attempt to act in Child's best interest by agreeing to Child's adoption by a

willing parent, Jamie W. Poncho (Poncho). Poncho's marriage to Child's mother, Ariel Poncho (Ariel), before Child's birth, and Poncho's close relationship with, financial support of, and agreement to adopt Child and be Child's father, was undoubtedly the beginning of a desired long-term relationship that may well have been in Child's best interest. Poncho's intentions and conduct appear to have been in good faith and sincere. However, after a relatively short time, about three years, the marriage fell apart. Poncho never initiated formal adoption proceedings and Poncho ultimately abandoned any intention of providing financial support for Child.

▪ {3} After setting out the background in this case, we discuss the doctrine of equitable adoption. We conclude that Bowdoin cannot by agreement abandon or relinquish his obligation as biological father to support Child unless excused pursuant to court order. We further conclude that the doctrine of equitable adoption is not applicable in the circumstances of this case. We make no determination whether Poncho may have joint or several liability, or be subject to claims of indemnity or contribution, based on his agreements and conduct. Lastly, we determine that Bowdoin is responsible for one-half the paternity testing cost.

## BACKGROUND

{4} We think it useful to recite the facts and proceedings in detail. Although we do not agree with the district court's application of equitable adoption, the background helps explain why the district court applied the doctrine in this case.

{5} Child was conceived in early 1997 while Ariel and James Bowdoin were dating. Soon afterward, Ariel met Jamie Poncho. Jamie offered to marry Ariel and adopt Child. In mid–1997, Ariel, Poncho, and Bowdoin met and all agreed that Poncho would marry Ariel; Poncho would take care of Ariel and Child; Poncho would support Child after birth and treat Child as his own; Bowdoin would not have anything to do with Child, would have no contact with Child, and would sign adoption papers at any time he was requested to do so; Ariel would not seek any support from Bowdoin; and Bowdoin would not be asked for anything nor would he ask for anything.

{6} Ariel and Poncho were married in September 1997 following Poncho's basic training, and Ariel moved to New York State where Poncho was stationed and undergoing advanced training. Child was born in November 1997. At birth, Child received the family name of Poncho and, with Poncho's and Ariel's consent, Poncho was named on Child's birth certificate as Child's father. Poncho was a combat medic in the United States Army and Child was listed as his dependent on Army records. Poncho and his employer's healthcare insurance paid for the expenses of pregnancy and birth. Child was raised as Poncho's son from birth, and Poncho and Ariel held Child out as Poncho's son. Child called Poncho "daddy" and knew no other father. Child knew Poncho's mother as his grandmother and as of trial had not been told that Poncho was not his father. With Ariel's consent, Child was enrolled as a member of Poncho's Tribe, Pueblo of Laguna, and was baptized as a Catholic in the Pueblo's church. However, when the Tribe later learned that Poncho was not Child's biological parent, Child was disenrolled as a member of the Tribe.

{7} In January 2001, Ariel filed an action for dissolution of her three-year marriage to Poncho. Their marital settlement agreement provided that Poncho would pay spousal support for eighteen months. According to what Ariel told Poncho, this was in lieu of child support. The marital settlement agreement provided for the annual exchange of financial information customarily used for adjusting child support. Poncho indicated in this divorce proceeding that he was willing and wanted to remain Child's father and to support Child financially. Poncho received visitation privileges. The court entered a final decree of dissolution in March 2001. As of the divorce, Poncho had not initiated adoption proceedings under the New Mexico Adoption Act (the Adoption Act), NMSA 1978, §§ 32A–5–1 to –45 (1993, as amended through 2005).

{8} Ariel also filed a separate action against Bowdoin under the New Mexico Uni-

form Parentage Act (the Parentage Act), NMSA 1978, §§ 40–11–1 to –23 (1986, as amended through 2004), to establish paternity and for child support. Bowdoin had not sought to see Child and had never made any inquiry concerning Child. Nor had Ariel ever requested any financial assistance from Bowdoin. In the Parentage Act lawsuit, Bowdoin denied paternity. Ariel introduced DNA evidence. The lawsuit went to trial toward the end of 2001, and the district court filed a thirteen-page memorandum decision in early 2002 that contained a recitation of facts and a legal analysis of the doctrine of equitable adoption.

{9} In its memorandum decision, the court concluded, based on the DNA and other evidence, that Bowdoin was Child's biological father but that Poncho was the adoptive father of Child "by virtue of an equitable adoption." The court also concluded that Bowdoin was "legally responsible for the support of [Child] unless and until [Poncho] becomes legally bound to support [Child]." The court then stated that, for Poncho to become legally bound to support Child, Poncho had to be joined as a party to the action and accept the decision of the court or be adjudicated as the adoptive father; a guardian ad litem had to be appointed for Child; Bowdoin had to comply with the Indian Child Welfare Act or establish why the Act did not apply; and the court had to be satisfied that it was in Child's best interest for Poncho to be Child's father in lieu of Bowdoin and to relieve Bowdoin from any parental obligation. Bowdoin was ordered to comply with these requirements within sixty days or the court would proceed to determine and award child support against Bowdoin. The court entered an order requiring what it had set out in its memorandum decision.

{10} Bowdoin moved for appointment of a guardian ad litem and to join Poncho, which the court granted. Poncho accepted service of various court-filed documents and consented to joinder. Poncho simultaneously filed an affidavit in which he consented to being joined as a party, stated that he had intended to intervene, and volunteered that the affidavit was made after seeking and obtaining advice from his attorney. He also stated his belief that it would be in Child's best interest that he, Poncho, be adjudicated as the adoptive father of Child in lieu of Bowdoin and relieve Bowdoin of that obligation. The affidavit also stated, among other things, that:

I was married to the natural mother of [Child] prior to his birth, I was present at and assisted in his birth, I am the only father or father figure that [Child] has ever known, I have bonded with [Child], and [Child] has bonded with me, as father and son, at all times since the birth of [Child] I have considered him as my son and I have treated him in all respects as my son. [Child] recognizes me as his father, and recognizes and refers to my mother as his grandmother.

{11} In hearings before the court, Poncho was represented by a staff judge advocate of the Department of the Army. Following this Court's dismissal in September 2002 of an appeal filed by Ariel due to lack of a final order, Bowdoin in March 2003 moved the court to enter an order joining Poncho, to appoint a guardian ad litem, to confirm equitable adoption by Poncho and lack of responsibility on Bowdoin's part to support Child. In April 2003, another counsel entered an appearance for Poncho and until October 2003, when he was permitted to withdraw, this counsel attended hearings on various motions and other matters. Poncho became pro se in October 2003.

{12} In September 2003, the court joined Poncho as a party and ordered Poncho to pay child support. A guardian ad litem was finally appointed. In November 2003, the court denied a motion by Ariel to dismiss Poncho, confirmed Poncho's obligation for child support that started in May 2003, and ordered Poncho to pay further child support amounts. In December 2003, Ariel moved for an order holding Poncho in contempt for failure to pay child support.

{13} As of March 2004, when the named guardian ad litem entered his appearance, neither Bowdoin nor Poncho had met with, or even contacted the guardian ad litem and no child support had been paid. Hearings occurred in March (merits) and June 2004 (presentment), at which neither Poncho nor

the guardian ad litem was present. In between the hearings, the court issued a bench warrant for Poncho's arrest on a contempt charge for failure to pay child support. For the March hearing, the guardian ad litem filed "recommendations," consisting, among other things, of statements that he had not been contacted by Poncho or Bowdoin, that he had only recently been advised of the March hearing, that he was unable to attend the hearing, that "the current status quo be maintained" as to custody and timesharing, and that his participation at the hearing would add nothing to the recitation of the issues before the court.

{14} After the June 2004 presentment hearing, the court entered a final order and judgment ordering, among other things, that Bowdoin was Child's biological father, Poncho was Child's adoptive father by equitable adoption, Poncho was responsible for child support from Child's birth, and Bowdoin had relinquished all parental rights to Child in favor of Poncho and had no responsibility to pay child support. The court also discharged the guardian ad litem and dismissed Bowdoin from the action with prejudice. Ariel appealed from that order and judgment.

{15} Neither Poncho nor Bowdoin filed responsive briefs on appeal, and this Court entered an order for them to show cause why the appeal should not be submitted for decision without any responses. Neither Poncho nor Bowdoin responded to this order. This Court was informed by the Clerk of the Supreme Court that Bowdoin's attorney had been suspended for non-compliance with continuing education requirements. For reasons we need not set out in this opinion, it appeared to this Court that Poncho and Bowdoin may not have received the brief in chief and the order, and after obtaining last known addresses for them, we entered and served another order to show cause. Bowdoin responded by unsigned letter, stating that he had not received "notice of these proceedings"; Poncho did not respond. We then ordered Bowdoin to file a response, but he did not do so.

{16} On appeal, Ariel asserts that: (1) the district court's application of the doctrine of equitable adoption contravened the Act, (2) the district court misapplied the doctrine, (3) application of the doctrine violated her constitutional rights as a biological mother opposing adoption, (4) the facts do not support equitable adoption, and (5) Bowdoin should pay his share of the paternity testing cost.

{17} As indicated earlier in this opinion, the district court stated in a memorandum decision and order that Poncho had to be joined and accept the decision of the court or be adjudicated as the adoptive father, that a guardian ad litem had to be appointed for Child, and that the court had to be satisfied that it was in Child's best interest for Poncho to be Child's father in lieu of Bowdoin and to relieve Bowdoin from any parental obligation, in order for the court to hold Poncho legally bound to support Child. Part of the conditions were fulfilled. Poncho was joined and by affidavit stated his belief that it would be in Child's best interest that he, Poncho, be adjudicated as the adoptive father of Child in lieu of Bowdoin and relieve Bowdoin of that obligation. Further, a guardian ad litem was finally appointed.

{18} It is important to note that part of the district court's conditions were not effectively fulfilled. The guardian ad litem was not appointed until some nineteen months after the February 2002 memorandum decision. Further, nowhere in the record is there any indication that Poncho or Bowdoin contacted the guardian ad litem, nor any indication that the guardian ad litem looked into whether it was in the best interest of Child that Poncho be the adoptive father and Bowdoin be relieved of parental responsibility or that the guardian ad litem advised the court on the matter of Child's best interest. Moreover, the record does not contain any findings or conclusions by the court on this question. Thus, as the case comes before this Court, equitable adoption was: (1) asserted by Bowdoin, the biological father who shed all parental responsibility; (2) agreed to by Poncho, the divorced husband and former stepfather who has defied court orders to pay Child support and who, it appears, is nowhere to be found; (3) opposed by Ariel, the natural mother of Child; (4) at most, acquiesced by the late-appointed guardian ad litem without any indication in the record of

any investigation into or consideration of the equitable adoption issue by the guardian ad litem; and (5) ordered by the court without any indication in the record that the court asked for and obtained any position, argument, or authority from the guardian ad litem on whether equitable adoption was in the best interest of Child.

## DISCUSSION

### ADOPTION AND EQUITABLE ADOPTION–GENERALLY

{19}   Adoption, unknown at common law, is a creature of statute. *Otero v. City of Albuquerque*, 1998–NMCA–137, ¶ 6, 125 N.M. 770, 965 P.2d 354; *Johnson v. Johnson*, 617 N.W.2d 97, 101–02 (N.D.2000); *In re Estate of Seader*, 76 P.3d 1236, 1239 (Wyo. 2003) (stating that adoption was unknown at common law and that the rights and liabilities emanating from adoption are governed by descent, distribution, and adoption statutes).

{20}   New Mexico's adoption statute is the Adoption Act. The purposes of the Adoption Act are to "establish procedures to effect a legal relationship between a parent and adopted child that is identical to that of a parent and biological child;" "provide for family relationships that will give the adopted child protection and economic security and that will enable the child to develop physically, mentally and emotionally to the maximum extent possible;" and "ensure due process protections." § 32A–5–2. The formality of court-approved adoption provides useful certainty in the law. *Otero*, 1998–NMCA–137, ¶ 16, 125 N.M. 770, 965 P.2d 354. The formality is designed to protect children from being adopted by unsuitable persons and it "clarifies the rights and obligations of the natural parent who may be supplanted by the adoptive parent." *Id.* ¶¶ 17–18.

{21}   New Mexico courts have recognized the doctrine of equitable adoption. *See id.* ¶¶ 6–12 (discussing New Mexico cases [1] and the underlying basis for the equi-

table adoption doctrine). Where the doctrine is applied, no formal adoption occurs; rather, the purpose of the doctrine is to permit the court to apply equity and to create a status that confers certain benefits to a child. *See id.* ¶ 20; *Johnson*, 617 N.W.2d at 101 (stating that the doctrine of equitable adoption "is not intended to create the legal relationship of parent and child, with all its attendant consequences, and does not effect a legal adoption"); *Estate of Seader*, 76 P.3d at 1240 (stating that equitable adoption "is never viewed as the equivalent of a formal adoption, in terms of establishing a parent-child relationship, and is merely a status invented by courts of equity as a means of allowing a child in an appropriate case to enjoy part of the advantage of adoptive status" (internal quotation marks and citation omitted)); *see also Lankford v. Wright*, 347 N.C. 115, 489 S.E.2d 604, 606 (1997) (stating that "[e]quitable adoption ... does not confer the incidents of formal statutory adoption[,]" but "simply recognizes the foster child's right to inherit" from foster parents who die intestate).

{22}   It appears the doctrine primarily arose from three elemental circumstances: (1) natural parents giving their child to foster parents or to be placed with foster parents who agree to adopt the child; (2) the foster parents fail to formally adopt the child under adoption laws; and (3) injustice to the child resulting when the foster parents die intestate and the child is not legally entitled to inherit absent a formal adoption under the adoption laws. *See, e.g., Ellison v. Thompson*, 240 Ga. 594, 242 S.E.2d 95, 96–97 (1978) (stating that the principle was first recognized in Georgia in 1913 when it was applied to allow a child to participate in the estate of a foster parent); *Johnson*, 617 N.W.2d at 101–02 (discussing the experimental relocation of homeless and indigent children between 1853 and 1929); Rebecca C. Bell, *Virtual Adoption: The Difficulty of Creating an Exception to the Statutory Scheme*, 29 Stetson L.Rev. 415, 416 (1999) ("Virtual adoption is an equitable doctrine created to protect

---

1.   These cases from earliest to latest are: *Barney v. Hutchinson*, 25 N.M. 82, 177 P. 890 (1918); *Wooley v. Shell Petroleum Corp.*, 39 N.M. 256, 45 P.2d 927 (1935); *In re Candelaria's Estate*, 41 N.M. 211, 67 P.2d 235 (1937); *In re Garcia's Estate*, 45 N.M. 8, 107 P.2d 866 (1940); and *Mares v. Martinez*, 54 N.M. 1, 212 P.2d 772 (1949).

the interests of a child whose foster parents agree to legally adopt but never complete all the steps to finalize the adoption.... In most states, virtual adoption benefits do not extend beyond inheritance rights in the foster parent's estate[.]" (footnotes omitted)); Beth Ann Yount, *Lankford v. Wright: Recognizing Equitable Adoption in North Carolina,* 76 N.C. L.Rev. 2446, 2447 (1998) ("For almost 100 years a majority of states have recognized equitable adoption as a solution to the injustice of declaring the seemingly adopted, yet not statutorily adopted, child a stranger to the foster parent's estate.").

{23} The Supreme Court of North Carolina noted in 1997 that "[t]hirty-eight jurisdictions have considered equitable adoption; at least twenty-seven have recognized and applied the doctrine" and further that "[a] majority of the jurisdictions recognizing the doctrine have successfully limited its application to claims made by an equitably adopted child against the estate of the foster parent." *Lankford,* 489 S.E.2d at 606; *see also In re Estate of Ford,* 32 Cal.4th 160, 8 Cal.Rptr.3d 541, 82 P.3d 747, 750 (2004) ("The doctrine is widely applied to allow inheritance from the adoptive parent: at least 27 jurisdictions have so applied the doctrine, while only 10 have declined to recognize it in that context."); *Estate of Seader,* 76 P.3d at 1241 ("The majority of states recognize equitable adoption in one form or another, although the doctrine has been explicitly rejected in others. Almost exclusively, the application of the doctrine has been limited to intestate estates." (footnote omitted)); Bell, *supra,* at 416–17 ("In most states, virtual adoption benefits do not extend beyond inheritance rights in the foster parent's estate," and stating that "[e]leven states do not recognize virtual adoption"); Tracy Bateman Farrell, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel,* 122 A.L.R. 5th 205, 230, 237–49 (2004) (stating that "[f]or the most part, executory contracts for adoption have been presented to the courts for enforcement only after the death of the promisor and for the purpose of recovering from the promisor's estate [what] the child would have been entitled to receive ... had the adoption contract been fully performed[,]" listing jurisdictions holding that the doctrine applies, giving a right to inherit, and listing jurisdictions holding against application of the doctrine).

{24} It is clear that the dominant presence of the doctrine of equitable adoption has been in inheritance pursuits to benefit a foster child. However, the doctrine has been raised in several different pursuits, including pursuits to benefit others than the foster child, such as a de facto (as opposed to legally recognized and approved) adoptive parent or other parties, and including claims outside of the inheritance context. *See* Farrell, *supra,* at 237–89 (discussing the applicability of the doctrine to particular situations), at 289–336 (discussing the applicability of the doctrine as dependent on particular circumstances).

{25} Courts have utilized equitable principles, and contract and estoppel theories to support application of the doctrine, and have invoked remedies consistent with those principles and theories, including specific performance, variations of estoppel, and equity. *See* Farrell, *supra, passim;* Yount, *supra,* at 2460–71, 2474; *see also* Elizabeth A. Gaudio, *Limiting the Scope of Equitable Adoption,* 54 Md. L.Rev. 822, 826 (1995) ("Most courts base equitable adoption upon one of two well-established theories: specific performance of the contract to adopt or promissory estoppel."). In applying or considering whether to apply the doctrine and under which underlying rationale to apply the doctrine, it is apparent that courts have encountered various problems, concerns, and dilemmas. *See Estate of Ford,* 8 Cal.Rptr.3d 541, 82 P.3d at 752–53 (discussing the difficulty of applying ordinary contract law to equitable adoption, indicating that this difficulty has been recognized by commentators and by courts in other states, and stating that "it has long been clear that the doctrine ... rested less on ordinary rules of contract law than on considerations of fairness and intent," and noting that "courts in several states have, instead of or in addition to the contract rationale, analyzed equitable adoption as arising from a broader and vaguer equitable principle of estoppel" (internal quotation marks and citation omitted)); Bell, *supra,* at 418–30; Yount, *supra,* at 2458–80. One commentator has

indicated that courts have expressed concern about the doctrine eroding formal adoption protections and about expanding application of the doctrine beyond circumstances of inheritance. *See* Yount, *supra*, at 2478–81.

{26} The mixture of equity, agreement, and estoppel have been expressed in different ways by different courts. For example, the court in *Lankford*, 489 S.E.2d at 606, stated:

> [The doctrine] simply recognizes the foster child's right to inherit from the person or persons who contracted to adopt the child and who honored that contract in all respects except through formal statutory procedures. As an equitable matter, where the child in question has faithfully performed the duties of a natural child to the foster parents, that child is entitled to be placed in the position in which he would have been had he been adopted. Likewise, based on principles of estoppel, those claiming under and through the deceased are estopped to assert that the child was not legally adopted or did not occupy the status of an adopted child.

In *Estate of Seader,* the Wyoming Supreme Court quoted, as have several courts, a passage from 2 Am.Jur.2d *Adoption* § 53, at 929–30 (2005):

> Generally speaking, the theory of recovery in an equitable adoption case is founded upon either equitable principles or upon the theory of estoppel. In the former it is a judicial remedy for an unperformed contract of legal adoption or, in the alternative, the ordering of specific performance of an implied contract to adopt. The estoppel theory operates to preclude a party from asserting the invalidity of a status of an "adopted" child for inheritance purposes. It has been said that a so-called "equitable adoption" is no more than a legal fiction permitting specific performance of a contract to adopt. Furthermore, the descriptive phrase "adoption by estoppel" has been described as a shorthand method of saying that because of the promises, acts and conduct of an intestate deceased, those claiming under and through him are estopped to assert that a

child was not legally adopted or did not occupy the status of an adopted child.

> An adoption by estoppel is an equitable remedy to protect the interests of a person who was supposed to have been adopted as a child but whose adoptive parents failed to undertake the legal steps necessary to formally accomplish the adoption; the doctrine is applied in an intestate estate to give effect to the intent of the decedent to adopt and provide for the child.

> The doctrine is predicated on principles of contract law and equitable enforcement of the agreement to adopt for the purpose of securing the benefits of adoption that would otherwise flow from the adoptive parent under the laws of intestacy had the agreement to adopt been carried out; as such it is essentially a matter of equitable relief.

*Estate of Seader,* 76 P.3d at 1240.

## THE *OTERO* CASE

{27} In *Otero,* we addressed the application of the equitable adoption doctrine in the context of a child seeking wrongful death damages for the death of his stepfather. 1998–NMCA–137, ¶ 1, 125 N.M. 770, 965 P.2d 354. Prior to *Otero,* all of the cases addressing the equitable adoption doctrine had been in the context of inheriting from an estate and all had been decided by our Supreme Court. *Id.* ¶¶ 7–12. The most recent case prior to *Otero* was decided in 1949. *Id.* ¶ 12. Those cases involved or required a contract for an adoption before applying the equitable adoption doctrine. *Id.* ¶¶ 7–12, 19.

{28} This Court recognized in *Otero* that the rationale behind application of the equitable adoption doctrine in New Mexico was estoppel. *Id.* ¶¶ 10, 19, 20. We also recognized that it was "worthwhile to examine whether the restrictions on our recognition of equitable adoption can withstand modern scrutiny." *Id.* ¶ 14. We favorably cited a test allowing a finding of equitable adoption, even when there was not a contract, when "the foster family's acts or omissions induced the child to believe that he was the foster parent's biological or formally adopted child." *Id.* ¶ 19. In doing so, we stated that "[i]t is hard to see how anything less could justify

overriding the requirements of the adoption statute." *Id.*

{29} In the end, we did not decide in *Otero* whether to extend the equitable adoption theory beyond the context of an estate dispute, to a tort action. We determined that under any test there was insufficient evidence of an equitable adoption. *Id.* ¶¶ 14, 23. We did note, however, that, given that the underlying principle behind the equitable adoption doctrine was estoppel, application of the theory to a defendant in a tort case was problematic because of the lack of behavior by the defendant warranting estoppel (such as a misrepresentation of parentage). *Id.* ¶¶ 20–21. We also noted concern about applying the equitable adoption doctrine in the context of a stepparent-stepchild relationship. *Id.* ¶ 22. While observing that "[c]ourts have seldom applied the doctrine of equitable adoption or its equivalents to treat a stepparent as an adoptive parent[,]" we noted several out-of-state cases that recognized equitable adoption by a stepparent and several others that relied on estoppel theories in finding an obligation of a stepparent to pay support for a child. *Id.*

## WHETHER EQUITABLE ADOPTION SHOULD BE APPLIED IN CHILD SUPPORT PROCEEDINGS

{30} In the present case, in holding Poncho to be the adoptive father by virtue of an equitable adoption, the district court turned to and analyzed cases footnoted in a law review article referred to extensively in *Otero*, 1998–NMCA–137, ¶¶ 13–23, 125 N.M. 770, 965 P.2d 354. *See* Jan Ellen Rein, *Relatives by Blood, Adoption, and Association: Who Should Get What and Why*, 37 Vand. L.Rev. 711 (1984). The Rein article footnoted cases on the question whether, after divorce, does a "foster parent have a continuing duty to support his equitably adopted child[?]" *See* Rein, *supra*, at 769, n. 234. The district court determined that some of the cases listed in the Rein article footnote were distinguishable and thought that two California cases invoking equitable estoppel to require child support, but not discussing the doctrine of equitable adoption, were closer in point. *See Clevenger v. Clevenger*, 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (Ct.App.1961); *see also In*

*re Marriage of Valle*, 53 Cal.App.3d 837, 126 Cal.Rptr. 38 (Ct.App.1975) (relying on *Clevenger* ). The district court determined that Poncho's conduct was "such that estoppel as described in the *Clevenger* case would apply[,]" namely:

> If the facts should show, however, that the husband represented to the boy that he was his father, that the husband intended that his representation be accepted and acted upon by the child, that the child relied upon the representation and treated the husband as his father and gave his love and affection to him, that the child was ignorant of the true facts, we would have the foundation of the elements of estoppel.

11 Cal.Rptr. at 714. The district court relied, too, on *Wener v. Wener*, 35 A.D.2d 50, 312 N.Y.S.2d 815, 818 (1970), in which the court held that a husband who impliedly agreed to support the child was obligated to provide support under an equitable estoppel theory. The district court in the present case noted that Poncho's agreement constituted "an express contract to support the child." Concluding its case survey, the court stated, in part, that the doctrine of equitable adoption as recognized in New Mexico should not be limited to cases of decedents' estates, but that, in the appropriate case, the doctrine may be used in domestic relations cases. The court determined that this case was an appropriate case. Further, the district court determined, based on what occurs in statutory adoptions, that if an adoptive father is obligated to support a child, it follows that the biological father should be relieved of that duty.

{31} No New Mexico case has addressed whether the doctrine of equitable adoption can be applied in child support proceedings. Several cases outside this jurisdiction have specifically addressed that issue and have refused to apply the doctrine in a child support situation. *See Fuller v. Fuller*, 247 A.2d 767, 769–70 (D.C.1968) (stating that the duty of the natural father of an illegitimate child to support his child is a continuing one, not relieved based on the conduct of another treating the child as though she was his natural child or by the mother's subsequent marriage to another); *Dep't of Human Res.*

*v. Tabb*, 221 Ga.App. 766, 472 S.E.2d 540, 541 (1996) (stating that application of virtual adoption doctrine was confined to inheritance cases and not applicable to a dispute as to responsibility for child support); *see also Burke v. Burke*, 137 Conn. 74, 75 A.2d 42, 45 (1950) (holding that a father cannot "relieve himself of his primary liability to maintain his child by entering into a contract with someone else to do so"); *Hobus v. Hobus*, 540 N.W.2d 158, 161 (N.D.1995) (holding that parents may not voluntarily terminate their rights in a child to avoid child support payments or contract away a child support obligation). Yet several cases have extended the application of equitable adoption to impose a child support obligation. *See, e.g., Johnson*, 617 N.W.2d at 105–08; *Geramifar v. Geramifar*, 113 Md.App. 495, 688 A.2d 475, 478–79 (Spec.App.1997) (stating that the case was a "textbook example of an equitable adoption" in which neither adoptive parent was a biological parent of a child obtained from Iran, and holding that "[i]n its role as *parens patriae*, it is the duty of a court to consider the child's best interest. In the case at hand, it is obviously not in [the child's] best interest to relieve appellee from his obligation to support him. Rather, it is in [the child's] best interest to be supported by those who were permitted to bring him to the United States from the Republic of Iran, after promising the Republic of Iran to support and care for him.").

{32} The facts in the present case are not in dispute and the issue of whether the district court erred in applying the doctrine of equitable adoption is an issue of law which we review de novo. *See N.M. Right to Choose/NARAL v. Johnson*, 1999–NMSC–028, ¶ 5, 127 N.M. 654, 986 P.2d 450 (holding that the threshold question of whether to adopt a doctrine is reviewed de novo). In our view, the district court extended the application of the equitable adoption doctrine beyond its intended scope. We are unpersuaded that the doctrine should be expanded to child support under these circumstances. We are also unpersuaded that Bowdoin has

any standing to assert the doctrine for his own benefit. Even were the doctrine to be extended to the child support context, the doctrine must be asserted by or on behalf of the child, not by the biological father for his own benefit. Further, we are unpersuaded that a biological father can be relieved of his obligation to support his child through an adoption agreement among the biological father, the biological mother, and a proposed and expectant adoptive father who expresses his intent to adopt. Under New Mexico law, a biological father [2] cannot walk away from his parental child support responsibilities without court approval. In New Mexico, there exists at the very least a presumption that the biological father is responsible for child support absent court-ordered relief to the contrary. *See Wallis v. Smith*, 2001–NMCA–017, ¶¶ 8–9, 16, 130 N.M. 214, 22 P.3d 682 (holding that misrepresentation by a woman to a man that she was practicing birth control was insufficient under the Uniform Parentage Act and New Mexico public policy to relieve the man as the biological father of child support obligation); *Tedford v. Gregory*, 1998–NMCA–067, ¶ 24, 125 N.M. 206, 959 P.2d 540 (holding biological father responsible under Uniform Parentage Act for back child support notwithstanding stepparent's support of child).

{33} We note that, in applying equitable adoption in a child support proceeding, the court in *Johnson* determined that "the best interests of the child are paramount, their importance often surpassing the interests of adults involved," and concluded that the application of equitable adoption to impose a child support obligation comports with that public policy. 617 N.W.2d at 105. In matters of children, our guiding light is to do what is in the best interest of the child. *See Wasson v. Wasson*, 92 N.M. 162, 163, 584 P.2d 713, 714 (Ct.App.1978) ("As a matter of public policy, in every proceeding in which minor children are involved, a court's primary obligation is to further the best interests of the child."). However, even were the

---

**2.** By "biological father," we do not intend to decide, one way or the other, whether in any one case or all cases, the person whose donated sperm creates the child is responsible for child

support. We limit our holding in this case to a person, such as Bowdoin, who engaged in sexual intercourse with Ariel, resulting in the birth of Child.

best interests of Child to be considered on the issue of liability for child support under an equitable adoption theory, no record of those interests was made in this case. No indication exists that the district court considered what was in the best interest of Child. No evidence was presented on that issue. The guardian ad litem took and expressed no opinion on the issue. The determination would be fact intensive and require factual adjudication, not an occupation for this Court. Ariel opposed equitable adoption. A competing public policy implicit, if not expressed, in *Wallis* and *Tedford,* is that the biological father remains responsible for child support. The biological father cannot freely contract away his parental obligation. In the absence of a formal adoption under the Adoption Act, the biological father cannot voluntarily effect a relinquishment of his parental duties imposed upon him by law.

{34} We will not speculate as to whether, and if so to what extent, the intended adoptive father and the biological father may each have an obligation to support the child under a theory such as joint and several liability, or the biological father may be entitled to indemnity or contribution from the intended adoptive father. What we hold in this opinion, reinforced by *Wallis* and *Tedford,* is that the biological father is responsible at the point of conception of the child. Whether the biological and intended adoptive fathers have liability issues between themselves pursuant to an agreement is an issue we need not, and do not, address in this opinion.

{35} We do note that, in some intended adoptive parent cases, a biological parent responsible for child support may be deceased, missing, unreachable, unknown, or indigent, and a court may be asked to look to the intended adoptive parent for child support. *See, e.g., Geramifar,* 688 A.2d at 476 (indicating that natural parents were Iranian); *Wener,* 312 N.Y.S.2d at 817–18 (holding the foster parents responsible for support where "the child's natural parents are unknown," and noting that an earlier New York case held that an agreement to adopt did not terminate the natural parent's duty of support but that in that earlier case, "the natural parent was alive and capable of providing for the child"). We need not, and do not in this opinion address the question of whether the equitable adoption doctrine or another equitable doctrine could create an obligation to pay child support in such a case.

{36} Because we agree with Ariel's point on appeal that the district court misapplied the equitable adoption doctrine, we do not address her other points of asserted error in regard to the court's application of the doctrine.

**TESTING EXPENSE**

{37} Ariel contends that Bowdoin owes and has not paid his share of the cost of paternity testing, as ordered by the district court. She asserts that Bowdoin's attorney's statement in open court that Bowdoin paid his share is incorrect. As a factual question, this issue can and should be addressed on remand.

**CONCLUSION**

{38} We reverse the judgment of the district court. We remand for further proceedings in regard to the extent of Bowdoin's responsibility for child support and paternity testing costs.

{39} **IT IS SO ORDERED.**

BUSTAMANTE, C.J. and ROBINSON, J., concur.